**The People of the State of Illinois, Plaintiff-Appellee, v. Vincent A. Moscatello, et al., Defendants-Appellants.**

**Gen. No. 68–154.**

Second District.

October 1, 1969.

John Powers Crowley and John J. Cogan, of Chicago, for appellants.

William J. Scott, Attorney General of State of Illinois, of Springfield, Fred G. Leach, Assistant Attorney General, and John H. Maville, State's Attorney, of Belvidere, for appellee.

MR. JUSTICE SEIDENFELD delivered the opinion of the court.

Vincent A. Moscatello, Frank Cullotto and Mike Swiatek, defendants, appeal from a judgment of conviction of armed robbery, and a sentence of 5 to 15 years in the penitentiary, after a jury verdict.

Defendants charge constitutional error in the denial of a pretrial petition for rendition of a prisoner held in another state (Kentucky) as a witness who had confessed to the instant crime in his extradition hearing held in Wisconsin; and in the denial of admission of the transcript of the third-party confession at the trial. Defendants also argue that the evidence failed to establish guilt beyond a reasonable doubt and that they were prejudiced by inflammatory arguments of the prosecutor.

The appeal was filed contemporaneously in both this Court and the Supreme Court of Illinois. We transferred the case on defendants' motion to the Supreme Court

which subsequently returned it here on the ground that no substantial constitutional question was involved.[1]

The action was commenced by the filing of an indictment on November 13th, 1967, charging the defendants with armed robbery of $14,413 from the One-Stop Pacemaker, Inc. in Belvidere, Illinois, alleged to have occurred on September 1, 1967.

Willie Halcomb, the co-manager of the Belvidere Pacemaker, testified that the robbery occurred shortly after the 10:02 a. m. Brinks money delivery. He heard the cashier, Sherry DalPra, state, "What are you doing in here?" He then saw a man, in back of her, lifting his sweater and pulling a revolver "half way out." The man told everyone to get back on the floor and allowed Sherry to cash checks. He testified that he only had a side view of the man; that he was in the office for only a few seconds; and that he was dressed in a black sweater and dark pants. Later he saw pictures and picked out a photograph that looked like the man and still later he saw him in person. He stated that the man was sitting in court with a small scar above his cheek, sitting to the right of his attorney.

On cross-examination he testified he had gone to a lineup approximately two or three weeks later and he did not see anyone that he could positively identify in the lineup. He could "halfway identify someone" but was not sure that any of the men in the lineup were one of the men that held them up. The man had his back to the

---

[1] "The defendants claim that they were denied process to compel the production of a witness. This claim is based on the refusal by the trial judge to certify that a prisoner confined in another State was a material witness, a finding which is necessary to initiate proceedings under the Uniform Rendition of Prisoners as Witnesses in Criminal Proceedings Act. (Ill Rev Stats 1967, c 38, §§ 157–1 through 157–11.) In our opinion this ruling by the trial court does not present a substantial constitutional question. On the Court's own motion the cause is transferred to the Appellate Court for the Second District."

witness and also his back to Sherry DalPra except for a few seconds, and he only faced Ramona Thornton for a few seconds.

Gerald DalPra, the manager of the store, testified that he was at the check-out counter, which was 10 to 15 yards from the office. He was not aware that the robbery had taken place until after it had been completed. He went to the office and was informed by Mrs. Thornton, his head checker, that they were robbed, and Mrs. Thornton pointed out one of the men who was the only one left in the store at that time. DalPra left the office and walked towards the man until he got within a few feet of him, and the man then stepped back and put his hand underneath his shirt and said that he had a gun, which the witness did not see. DalPra, in the courtroom, identified that man as defendant, Frank Cullotto, and testified that he was wearing a loud, green sport shirt outside his pants. The man walked out of the store, and DalPra went back to the counter and told someone to call the police. He then went back to the door and tried to write down the license number of a cream-colored Chevrolet, 1959 or 1960 model, which the man was entering. Later that day he was shown some photographs by Sheriff Aten and picked out a picture of Frank Cullotto. Approximately a week later he went to a lineup in Chicago, saw five men, and picked out the defendant Cullotto from the lineup.

On cross-examination he testified that he had given the police a description of the man as wearing a loud, green sport shirt and glasses and that he was between 5 feet 10 and 5 feet 10½ inches, and 170 pounds. He stated that he was standing 6 or 8 feet away from him and looked at him for possibly 15 seconds, and that the man was a stranger to him. When he went to the lineup in Chicago he already knew the name of the man whose picture he had identified was Frank Cullotto. During the lineup, each man was required to state his name. At the lineup the

21

witness possibly said, "The man who said his name is Frank Cullotto, that's the man whose picture I identified and the clothing he wore at the time." He recognized Frank Cullotto in the courtroom as the man whose picture he had identified and he had no doubt in his mind after viewing the pictures. He had no doubts as he testified that defendant Cullotto was in the Pacemaker store on September 1st, 1967.

Ramona Thornton, the head cashier, testified that a few minutes after Brinks had made a delivery of money to the store, she was in the office and had the bag of money in her hand and had not yet put it in the safe. She heard the door and turned around, and Sherry Dal Pra came into the office and right behind her was a man. The man walked up alongside of her and had a gun in his hand and a yellow plastic pail. He said, "This is a holdup, don't try anything funny." Then he told her to get down on the floor. The robber told her to open the safe, and she replied that she couldn't. He then opened the safe and took all the currency out and took two envelopes out of the top. He then turned from the safe and took the Brinks bag from her. He went over to the register and took three bundles of money from the drawer under the register. She saw another man standing just outside the courtesy counter, behind a carton of cigarettes, who had a gun. She also saw a third man who was standing by the wall near the shampoo rack. He walked out of the store when the man in the office who had been taking the money moved out. Then the one in front of the courtesy counter moved over in that position.

She was later shown pictures in the upstairs office of the store and she identified two men and the man inside the office tentatively. The man she identified tentatively was Vincent Moscatello and the other two were Frank Cullotto and Mike Swiatek. She described Moscatello as wearing a golf cap, black wash slacks, a black sweater, open down the front and buttoned at the waist,

22

which had a yellow and white stripe diagonally down to the waist, and a sport shirt underneath. Cullotto wore some type of a yellow sweater, gray wash slacks and a cap and glasses that she believed to be the same type he was wearing in the courtroom. She testified that Swiatek had a cap, a loud, tropical print shirt and wash pants. She was not sure of the color. She was later taken to Chicago and saw a lineup where she identified Cullotto and Swiatek. She was doubtful as to Moscatello because of height, but when she saw him sitting down in the courtroom she would say that it was him.

On cross-examination she testified that she had given a verbal statement to Sheriff Aten. She recalled also being interviewed by the two young lawyers from Kentucky on April 8th, 1968, and telling them that the reason she could not identify the man the sheriff said had entered the cage was because of height difference.

Sheryl DalPra, a sister of Gerald DalPra, testified that she entered the office of the store shortly after the Brinks messenger left and she was followed in by a man. She asked him what he was doing and he told her don't try anything that this was a holdup. He then told her, Ramona Thornton, and Halcomb to get down on the floor. He also told her that if anyone came to the office to cash any checks, that she was to do so. She had her back to him when he followed her in, and then she turned and looked at him. The man then walked over towards the back of the courtesy counter and told Ramona Thornton to open the safe. After she replied that she didn't know how, he put on a brown glove and opened the top safe and put on another glove and opened the bottom safe and took an envelope from the top and took the money out from the bottom, as well as the Brinks bag that Ramona Thornton had in her hands. The phone then rang and Sheryl answered it. She also cashed a check for a customer and gave him money for returned bottles. By that time it was all over.

During the period of time the man was in the office she was back to back, or more or less to the side of him. There was another man outside the cage who showed her part of a gun, and then she turned her back on him. She looked off the side to her left, and there was another man standing over by the doorway near the shampoo display. Prior to the robbery she had noticed all three men as having walked into the store together, more or less single file, with about 5-foot intervals between them. They walked back into the produce department where she was putting up an ad and then walked over to the meat department where she was putting up an ad.

In court she identified Moscatello as being the man inside the cage, Cullotto as being the man in front of the courtesy counter, and Swiatek as being the man off to the side of the doorway. On the evening of the robbery she had been shown photographs by Sheriff Aten and she identified all three of the defendants. She testified that Moscatello at the time of the robbery had a dark cap on, a sport shirt, a black sweater and black slacks, that the sweater had a diagonal yellow and white stripe which went downward and buttoned where the stripes met; that Cullotto had on a brown, bright print shirt, glasses which looked like army glasses, and light slacks; and that Swiatek had on a yellow sport shirt, a sweater, a jacket type of thing, with a cap and grayish slacks.

On cross-examination she testified that the descriptions she gave of the clothing were the same descriptions she gave to Sheriff Aten on the day of the robbery. She told the sheriff that Moscatello had a visible scar over his left eye, but that as she looked at Moscatello in court the scar was not over the left eye, but was on the side of his eye. She said that when she gave the descriptions to the sheriff and to the police captain both men wrote them down.

24

Ruth Ellen Brown testified that she was a customer at the store, arriving there at approximately 10:00 o'clock. She went outside the store to drive her car around to pick up boxes and as she left the store and was walking through the check-out counter the manager of the store, Jerry DalPra, was right behind her. He more or less followed her out. Three men came out of the store following her, walking rapidly, and as she approached her car, she noticed a white Chevrolet sitting next to it. The three men got into the white Chevrolet and as they opened the door they bumped her car. She recognized two of the men and later that day she looked at certain photographs which were shown to her by Sheriff Aten and picked out Cullotto and Swiatek. About a week later she went to a lineup in Chicago involving five people and at that time again picked out Swiatek and Cullotto. She testified that the driver of the car, Swiatek, was dressed in gray trousers and yellow-gold sweat shirt. The other man, Cullotto, had on a bright shirt, an Hawaiian-type shirt, dark trousers, and his glasses were tinted.

On cross-examination she testified that she had only seen the men a couple of seconds or so. She testified that at the lineup Frank Cullotto had stepped forward and had given his name and she may have heard that name before. She did not recall how Cullotto was dressed on the day of the lineup.

Lester Aten, the Sheriff of Boone County, testified that on September 1, 1967, he found a cream-colored Chevrolet, 1959 or 1960, by the Highland Hospital and that the car had been reported stolen by a Mr. Boerdman.

On cross-examination he testified that he did not go thru the car to determine if there was anything in the car to connect any of the defendants. He further testified that he did not take any written statements from any of the witnesses and that none of the witnesses had de-

25

scribed to him the wearing apparel of the men who held up the store.

Vincent Moscatello testified for the defendants that he had a scar on the left side of his cheek since he was about 4 years old. He testified that between the 11th and 15th of September, 1967, he was in a showup in Chicago and after the showup he was not charged with any offense and he left and went home. He denied being present in the City of Belvidere and participating in the holdup at the One-Stop Pacemaker on September 1, 1967.

Moscatello testified that around the time of the robbery he was dating a woman named Gloria Dante, and was in her home in Chicago. He had stayed at that address all night. Gloria's sister Karen was there also, as well as Gloria's mother, Carol Dante, and Marie Kuputta, a close friend of Carol and Karen. The father of the girls, James Dante, was not there. He testified that Carol Dante and James were divorced.

Carol Dante testified that Moscatello roomed and boarded at the house and that she was sure he was there on September 1st, 1967. She was not divorced on that date. Her husband was not there at the time, having left for work at 7:30 in the morning.

Gloria Dante, Carol Dante's daughter, testified that on September 1st, 1967, she was living at the address with her mother, sister, brother and her mother's husband, as well as Vince Moscatello. She testified that on September 1st, 1967, Moscatello was having breakfast in the home. Another daughter, Karen Dante, testified that on September 1st, 1967, at 10:00 o'clock in the morning Vincent Moscatello was in the house. She didn't remember if her stepfather was living there at the time.

Michael Swiatek testified on his own behalf that he was employed in Chicago as a cook and pizza maker and that his hours of work were from 4 in the afternoon until 12 o'clock midnight; that on September 1, 1967, at

26

about 10 o'clock in the morning he was receiving a ticket in Oak Park, Illinois, and that Frank Cullotto was with him at that time. The ticket was for speeding and he received a citation from Officer Reichert of the Oak Park Police Department.

On cross-examination Swiatek testified that he was driving Frank Cullotto's car and it was under Frank Cullotto's mother's name. He pleaded guilty to the offense in court and paid a fine.

Lawrence Flynn testified for the defendant that he was a private investigator from Racine, Wisconsin, and that on October 13th, 1967, he interviewed Ramona Thornton and asked her if she could identify any of the men charged with holding up the Pacemaker. She stated to him that the sheriff had taken her and some others down to Chicago to view suspects in a lineup and that she was unable to identify any of them.

Foster Jones testified for the defendant that he was an attorney licensed to practice in Kentucky, and that he had spoken to Ramona Thornton approximately the first week of April, 1968. He asked her about the identification of defendants in this case and she told him that she could identify one of them and that would be the person who stood outside the cashier's cage. She testified that she attended a showup in Chicago, but that she could not positively identify anyone at that time. Jones testified that about June 9th or 10th, 1968, he again talked to Ramona Thornton at the Pacemaker Super Market and Halcomb, the manager, was present, and Mr. DalPra was briefly present. She then said she could possibly identify two of the men and that she had identified them by the position in the store—the one by the door and the one in front of the cage. He asked her about the man inside and she said that if she ever saw him she could identify him but she had not seen him.

Finally, the defendants made an offer of proof of the transcript of the extradition hearing in the matter of the detention of Carl Sims Pankey in Wisconsin, which offer was denied.

Ramona Thornton testified in rebuttal that in each instance she had identified two suspects, but did not identify the third, and that as to the third she told the investigator that there was a resemblance in the size.

Fremont Nester testified that he was the Chief of Police of Oak Park and that his records showed that Sgt. Reichert began his work at 4:00 p. m. on the afternoon of September 1st, 1967. On cross-examination he said that the records indicated that the driver's license taken from the violator was the same number as Swiatek's driver's license. He testified that the tickets usually go to court within two days, but since there was an intervening weekend there was nothing particularly unusual about the fact that a ticket issued on September 1st did not arrive in court until September 6th. He testified that Reichert, who was a member of the department on furlough, would not be back until the first part of August. He was permitted to testify to a conversation with Reichert to the effect that he issued the ticket on whatever date appeared on the ticket.

The ticket, in evidence, shows the time of 9:50 a. m. Defendants argue that the evidence failed to establish the guilt of the defendant beyond a reasonable doubt because that of the prosecution was based solely on identification testimony and in which some inconsistencies appear, contrasted with "unrebutted alibi evidence" offered by defendants.

In determining whether the alibi is sufficient to raise a reasonable doubt, the case must be judged on all of the evidence. Contradiction of the identification witnesses by alibi witnesses raises questions of sufficiency of the identification and the credibility of witnesses, with no presumption in favor of either kind of evidence. See The

28

People v. Hicks, 22 Ill2d 364, 366, 176 NE2d 810 (1961) ; The People v. Cox, 22 Ill2d 534, 539, 177 NE2d 211 (1961). Sufficiency of identification is ordinarily a question of fact and the finding by the trier of the facts is not to be reversed unless the testimony is so unsatisfactory as to leave a reasonable doubt as to guilt. The People v. Brengettsy, 25 Ill2d 228, 231, 184 NE2d 849 (1962). Similarly, it is for the trier of fact to determine the credibility of an alibi. The People v. DiGerlando, 30 Ill2d 544, 551, 198 NE2d 503 (1964) ; The People v. Ault, 28 Ill2d 34, 36, 190 NE2d 815 (1963). It follows that an alibi cannot be disregarded and if the identification testimony is so unsatisfactory that upon the whole record the evidence does not create an abiding conviction of defendant's guilt, the judgment of conviction must be reversed. The People v. Jefferson, 24 Ill2d 398, 402, 182 NE 2d 1 (1962) ; The People v. Kidd, 410 Ill 271, 279, 102 NE 2d 141 (1951).

██ The eyewitness identification testimony in this record is not of that unsatisfactory or doubtful nature so as to create a reasonable doubt of defendants' guilt. Gerald DalPra testified that he viewed Cullotto for up to 15 seconds and positively identified him as one of the men who held up the store. Ramona Thornton identified all three men. Sherry DalPra identified all three of the defendants after testifying that she had more than adequate opportunity to observe them. Mr. Brown identified two of the defendants. While there were inconsistencies in the testimony as to the color of the clothing worn by the defendants, as to the time elapsed for observation and as to various statements made immediately after the robbery, the identification testimony of the witnesses was not impeached in any essential aspect. Where witnesses agree substantially in their descriptions, minor discrepancies in their testimony will not cause reversal. The People v. Boney, 28 Ill2d 505, 509, 192 NE2d 920 (1963).

Defendants' reliance on People v. Kidd, supra, and People v. Jefferson, supra, is misplaced. The identification testimony in each of the cited cases was so weak and tainted that there was practically no identification testimony to be overcome by the evidence of the alibi.

Defendants also claim that the final argument of the prosecutor in rebuttal resulted in prejudicial error requiring a reversal.

The first instance to which defendants refer is to the prosecutor's stating:

> Now he says, where are these mug shots, where are these pictures. He would scream if I had three police identification photos with numbers on them.

The court properly sustained an objection to the argument and instructed the jury to disregard the statement. The remark moreover, was made in response to the argument of defense counsel, referring to pretrial identification by photographs:

> And what about these photographs that they keep telling us about? Have we ever seen the photographs that these witnesses looked at, these 35 or 40 photographs. Where are they?

The characterization "mug shots" was improper, but the reference is not reversible error in view of the prompt ruling of the court and in view of the fact that the photographs were not admitted into evidence and there was no reference made to defendants' prior criminal record. See The People v. Maffioli, 406 Ill 315, 322, 94 NE2d 191 (1950); and People v. Ogden, 77 Ill App2d 312, 313, 222 NE2d 329 (1966). We distinguish United States v. Reed, 376 F2d 226, cited by defendants, because there testimony was permitted which established that the "mug shots" were from the prison and were of former inmates, and other references were made to the defendants' record, criminal activities and time served. In United States v.

Robinson, 406 F2d 64, reference by the prosecutor to "mug shots" in his opening statement was deemed ill-advised but not reversible error when not accompanied by anything suggesting past criminal activities.

Defendant complains of the prosecutor's argument that he did not call Sgt. Reichert to testify relative to the issuance of the ticket because he had been served with notice that counsel for defendants intended to call Reichert. The court made it clear to the jury that they were to disregard the statement if there was nothing in the evidence regarding such notice. In addition, the argument was in response to defendants' counsel stating, with reference to the State's evidence purporting to impeach the date of the traffic ticket issued to Swiatek, that Reichert was "still an Oak Park Police Officer."

Defendant also complains of the prosecutor's argument as to the traffic ticket.

But it wasn't written on 9–1–67 at 9:50 a. m., as inferring that the prosecutor had personal knowledge of this outside the record.

We do not give this statement that effect. The argument was consistent with the State's position that Swiatek could not have been the one receiving the ticket at the time when he was positively identified as a participant in the robbery, a great distance removed.

■ Considering the comments in the light of the evidence of guilt presented by the prosecution, we cannot say that the arguments represented a material factor in the verdict justifying a reversal of the judgment. The People v. Nicholls, 42 Ill2d 91, 245 NE2d 771 (1969).

We next consider defendants' claim of prejudicial error in the refusal to admit into evidence the transcript of the third-party confession.

■ We find no error in the trial court's refusal. Defendants reason that third-party confessions are similar to declarations against pecuniary or proprietary interests

which are generally admissible as exceptions to the hearsay rule. They suggest the general rule that hearsay declarations against penal interests are not admissible has been criticized and rejected by the weight of authority.

■ The issue has been resolved for us by The People v. Lettrich, 413 Ill 172, 178, 108 NE2d 488 (1952). Lettrich supports the general rule that extrajudicial declarations of a third party that he committed a crime are hearsay, and even though they are declarations against interest, are inadmissible except "where it is obvious that justice demands a departure." There, evidence that the defendant's confession was coerced; all witnesses of the confession had not testified at the hearing; that the confession was the only evidence against the defendant and there was no other evidence that would connect him to the crime, were held to be special circumstances requiring a departure from the general rule in the interests of justice. In the subsequent case of People v. Dowling, 95 Ill App2d 223, 227, 238 NE2d 131 (1968), the court delineated the Lettrich special circumstances rule, basically noting that where there is overwhelming evidence of defendant's guilt, especially the direct, unequivocal and unimpeached testimony of eyewitnesses, special circumstances do not exist under which a third-party confession would be admitted.

Considering the motive of Pankey to falsify his confession in order to avoid the more serious prosecution in Kentucky and the absence of special circumstances in view of the eyewitness testimony in the record, there is no guaranty of trustworthiness that would justify the absence of cross-examination and the presenting of a witness' demeanor to the trier of fact.

We believe, however, that the court committed error in denying the pretrial petition of defendants for rendition of a prisoner in another state, on the ground that the witnesses' testimony was not material.

The petition was filed on December 15th, 1967, in accordance with the provisions of the Uniform Rendition of Prisoners as Witnesses in Criminal Proceedings Act (Ill Rev Stats 1967, c 38, § 157–1 et seq.). Material here is section 157–6 and section 157–7 which provide:

157–6. Sec. 6. Prisoner from Another State Summoned to Testify in this State.) If a person confined in a penal institution in any other state may be a material witness in a criminal action pending in a court of record or in a grand jury investigation in this State, a judge of the court may certify (1) that there is a criminal proceeding or investigation by a grand jury or a criminal action pending in the court, (2) that a person who is confined in a penal institution in the other state may be a material witness in the proceeding, investigation, or action, and (3) that his presence will be required during a specified time. The certificate shall be presented to a judge of a court of record in the other state having jurisdiction over the prisoner confined, and a notice shall be given to the Attorney General of the state in which the prisoner is confined.

157–7. Sec. 7. Compliance.) The judge of the court in this state may enter an order directing compliance with the terms and conditions prescribed by the judge of the state in which the witness is confined.

Among other allegations, the petition stated that one Carl Sims Pankey was presently confined in a Louisville, Kentucky jail (and one "Swaite" was presently confined in a California jail and would be confined in the Kentucky jail on December 15th, 1967); that Pankey, on November 2nd, 1967, had testified under oath in extradition proceedings in Racine County, Wisconsin, that he and Swaite committed the offense of armed robbery of the One-Stop Pacemaker in Belvidere, Illinois, on September 1, 1967; that defendant Mike Swiatek was is-

sued a traffic ticket in Oak Park, a distance of 75 miles from the scene of the robbery, at about 10:00 a. m. on September 1, 1967; that witnesses at a preliminary hearing on the Illinois charge of armed robbery had testified that the robbery of the One-Stop Pacemaker took place between 10 and 11 a. m. on that September 1st date; that Kentucky has adopted a uniform reciprocal statute providing for the attendance of witnesses in criminal proceedings in another state if the Kentucky court certifies, pursuant to Kentucky Revised Statute, § 421.240, "that a person being within this state is a material witness in such prosecution." The petition requested that the court certify that criminal proceedings were pending in Illinois and that Carl Sims Pankey and Swaite are material witnesses and that their presence was required upon a trial date to be designated by the court.

The petition was supplemented at a later date to include the transcript of the Wisconsin hearing containing Pankey's full and detailed confession to the armed robbery of the One-Stop Pacemaker in Belvidere, Illinois, on September 1, 1967.

It further appears from the record that Pankey was extradited to Kentucky in connection with a charge of armed robbery and the murder of a police officer alleged to have occurred on September 1, 1967, in Louisville, Kentucky, and that Pankey was positively identified by an eyewitness as a participant in the Kentucky crime.

The court below denied the pretrial petition, commenting that it was a question whether he could abuse his discretion if he denied the petition and concluding that Pankey's "only purpose is to evade the prosecution in Kentucky." The trial court noted Pankey's immunity from prosecution here if brought back as a witness and then stated that Pankey "is not a material witness in this case." The court then denied a motion to continue this case until a conclusion of the Kentucky trial (subsequent to these rulings but before the trial of the instant

case, Pankey was convicted of the Louisville armed robbery and murder of September 1, 1967).

 The statement of Pankey is not a simple admission that he committed the robbery of the One-Stop Pacemaker, but is a detailed description, closely coinciding with the testimony of the prosecution. The confession relates the theft of a cream-colored Chevrolet and its subsequent abandonment in the hospital parking lot. It also relates that the car contained empty pop bottles, refers to the Brinks delivery, the time of the robbery, the men walking to the back of the store, the taking of the money from the safe, the placing of it in a plastic bucket, and the manager's attempt to capture the robbers. The burden of establishing the matter of the materiality of the testimony desired is recognized by defendant. People v. Nash, 36 Ill2d 275, 280-281, 222 NE2d 473 (1966); In re Grothe, 59 Ill App2d 1, 8, 208 NE2d 581 (1965). The language of the Rendition Act ("may be a material witness"; and (a judge) "may certify") is language of discretion. But the State rightly concedes, as did the trial court, that "discretion" cannot be absolute, but must be subject to review for abuse particularly where rights of substance are involved.

The People v. Nash (supra) is authority for the fact that the Uniform Act to Secure the Attendance of Witnesses, being Ill Rev Stats 1967, c 38, §§ 156-1 to 156-6 (whose provisions are essentially similar to those of 157-6 with which we deal here in the area of discretion) covers only material witnesses, and a judge is justified in refusing to certify that the persons named in a petition are material witnesses when he has nothing before him but the names and addresses of the persons requested and a statement by defendant that these persons are material witnesses. (See page 281.)

The precise question as to the limits of judicial discretion under the Rendition Act appears to be of first impression in Illinois. There have, however, been a limited

number of somewhat relevant decisions in other jurisdictions, none of which have been cited to us by the parties.

In People v. Cavanaugh, 69 Cal2d 262, 70 Cal Rptr 438, 441–443, 444 P2d 110 (1968), the California Supreme Court construed its Uniform Rendition Act as requiring the defendant to show, in a hearing, that the testimony to be given by the proposed witnesses is material and that even after such a showing the judge could decide not to bring even a material witness from out of the state in his sound discretion. In that case the facts were that the defense counsel filed an affidavit listing eleven proposed witnesses whom he desired to have brought from Massachusetts, advising the court that every one was an alibi witness. (However, the affidavit had value as to the proposed testimony of several of the witnesses and was silent as to the remainder.) The court citing the inconvenience and expense of disrupting the lives of all the named persons on such an inadequate showing ruled that he would deny the petition but would entertain a motion in due course, after oral or written interrogatories had been taken, to renew the motion for one or perhaps two witnesses. Thereafter, interrogatories were submitted and the court appointed the public defender of Boston as commissioner to examine the witnesses, and in due course the answers of seven of the witnesses were received and filed, and four others were found to be unavailable or uncooperative. A motion then was made by defense counsel for four of the seven witnesses to be brought from Massachusetts. The court indicated that the testimony of each was substantially the same and that this would be an unnecessary duplication, which defense counsel conceded. The court granted permission to bring in two of the witnesses, also permitted the deposition of the remaining witnesses to be used at the trial. The Supreme Court in deciding that discretion was not abused said on page 444:

"Discretion is abused only when 'the court exceeds the bounds of reason, all of the circumstances before it being considered.' (Citations omitted.) In the light of defendant's meager showing of materiality and the substantially cumulative nature of much of the proposed testimony, we cannot say that the court 'exceeded the bounds of reason' when it permitted defendant to select his two best witnesses for testimonial duty and to read the depositions of the others to a carefully-instructed jury. Here, as in United States ex rel. State of Pennsylvania v. McDevitt (DC App 1963), 196 A2d 740, 741, 'The trial court's determination was not arbitrary, capricious or unreasonable. . . . Therefore, we hold there was no abuse of discretion by the trial judge in denying process compelling the attendance' of a witness under the uniform act."

In State v. Smith, 87 NJ Super 98, 208 A2d 171, 174–5 (1965), the Superior Court of New Jersey, Appellate Division, held that the remedy under the Uniform Act to Compel the Attendance of a Witness from Another State in a criminal proceeding in New Jersey was not available to a defendant on the mere unsupported conclusionary oral statements by defendant's attorney. That the witness resided in "Royer Run, Pennsylvania" and that he was "a person from whom he acquired or allegedly acquired the goods which are the subject matter of the complaint of indictment" were legally and factually insufficient to show that Sabol was a nonresident material witness who would give favorable and material testimony in aid of the defendant. Defendant merely testified that he required the presence of Sabol. There was also no specific information in the record as to where Sabol could be found which was the further basis of sustaining the court's refusal to "initiate the complex judicial process

37

necessary under these acts to procure the attendance of out of state witnesses."

In State v. Bagges, 350 Mo 984, 169 SW2d 407, 409 (1943), the Missouri Supreme Court ruled on a defendant's application for a writ of habeas corpus ad testificandum (predecessor to the uniform acts involving foreign witnesses), and held that it was error to refuse an offer of proof that a third party would testify that he was one of the persons who committed the robbery in question and that the defendant did not participate. The court held that such testimony was material to defendant's defense.

We recognize the difficulties of defining "judicial discretion" and setting its limits except on a case to case basis. In The People v. Pfanschmidt, 262 Ill 411, 104 NE 804 (1914), the Illinois Supreme Court was ruling on an application for a change of venue on account of prejudice of the inhabitants of the county. In conceding that the application was addressed to the sound legal discretion of the trial judge, the court found an abuse of this discretion under the circumstances. On pages 440-441 the court said:

> "By judicial discretion is meant sound discretion guided by law. It does not mean an arbitrary discretion. (9 Am & Eng Ency of Law,—2d ed—473; 14 Cyc 384.) 'Judicial power is never exercised for the purpose of giving effect to the will of the judge, —always for the purpose of giving effect to the will of the legislature; or, in other words, to the will of the law.' (Osborn v. United States Bank, 22 US 738.) Deciding what is just and proper under the circumstances of a case is such judicial discretion. In all cases courts must exercise a discretion, in the sense of being discreet, prudent and exercising cautious judgment. (Murray v. Buell, 74 Wis 14; Abbott v. L'Hommedieu, 10 W Va 677.) A judicial discretion, in practice, is 'the equitable decision of what is just

38

and proper under the circumstances.' (1 Bouvier's Law Dict—15th ed—537; see also, Black's Law Dict —2d ed—375; 3 Words and Phrases, 2095, 2098; Trustees of Schools v. School Directors, 88 Ill 100; 6 Ency of Pl & Pr 819.) Abuse of discretion does not mean only the decision of a case by whim or caprice, arbitrarily or from a bad motive, (Citizen's Street Railway Co. v. Heath, 62 NE Rep 107), but it also means that the discretion has not been justly and properly exercised under the circumstances of the case. Murray v. Buell, supra."

The State cites People v. Ashley, 34 Ill2d 402, 412, 216 NE2d 126 (1966), as authority for the statement that a reviewing court will not interfere with the trial court's rulings on matters addressed to its discretion where the record does not show an abuse of discretion by the trial judge and a clear showing of prejudice. There the petitioner's presence at a post-conviction hearing was held to be a matter ordinarily committed to the sound discretion of the judge, and where the defendant first appeared and, being dissatisfied with his counsel, requested a new counsel and asked that he be returned to prison, he could not charge error in his absence at the subsequent hearing. We do not find it any authority here.

Reference to "discretion" or "abuse of discretion" is meaningless unless a trial court's acts which will stand on appeal can be measured against standards ascertainable in advance.

The granting of discretion to the trial judge recognizes the superior vantage point of one who sees and hears the witnesses when the record cannot reproduce actual trial conditions; the practical necessities of judicial administration in procedural matters; and the necessity of the trial judge's leeway in evolutionary phases of the development leading to fixed rules of law. Where matters of the administration of the court's business are involved, such as for example, whether to allow a pretrial conference, dis-

39

cretion may be practically absolute. In matters of trial procedure such as order of proof or ruling on rebuttal testimony, discretion may be very wide; in awarding a new trial, discretion may be considered more limited; in the area of declaratory judgment or equity jurisdiction, discretion may be narrowly proscribed by rules of law which have been carved out on a case-by-case basis, or a broader exercise of discretion may be approved where no limiting rules of law or equity have been laid down and the case is more unique, with the ruling dictated by necessity. See Delno v. Market St. Ry. Co., 124 F2d 965 (1942); The Atchison, T. & S. F. Ry. Co. v. Barrett, 246 F2d 846 (1957).

But few of these considerations are relevant under the circumstances of this case. Here we are dealing first with an exercise of discretion to determine what is *material*. That inquiry is addressed to a question of fact. The trial judge did not see the witnesses in Wisconsin, and in this connection has no superior vantage point to which we would ordinarily afford great weight.

It may be that, as suggested in People v. Cavanaugh, supra, (page 441), the language of the Rendition Act declaring that the judge "may" issue the certificate of demand, means that a decision to bring even a material witness from out of state remains within his sound discretion. But the discretion must be related to the materiality of the testimony sought, viewed in the whole case, in order to provide any meaningful standard. In this context, merely cumulative evidence or evidence on a relatively unimportant part of the case, even though material, might be excluded in the court's exercise of discretion, in view of the expenses of bringing the witness in the particular case, as well as in future cases based on the precedent. But this is not involved within the facts of this case, and the court, in fact, recognized that the standard it was applying was the materiality of the testimony.

40

It seems undeniable that the confession of a third person excluding the participation of these defendants in the crime is material to the case. The State argues that the confession is too detailed so that it is obvious that the defendants and Pankey were in communication between the date of the robbery and the date when Pankey, for the first time, confessed to the Belvidere robbery, after already having been charged with the murder and robbery in Kentucky. We appreciate that the trial court was calling on his long experience in criminal cases to detect what appeared to him to be a mere device to avoid extradition or involvement in the more serious offense in Kentucky. But this requires considerable speculation outside the record and the ruling that the statement was not material cannot be sustained on the record. Because of the motive to falsify and the presence of eyewitness testimony, Pankey's proposed testimony may have been entitled to little weight (and the court's view may be said to have been buttressed after the fact by the conviction of Pankey in the Kentucky trial), but we would be required to hold that discretion is given to the court not only on the issue of materiality but also on the issue of credibility to sustain the trial court's action.

 While, apart from statute, there is no right to compulsory process of witnesses outside of the jurisdiction of the court, the adoption of the statute would appear to be a recognition that defendants should have the opportunity to secure material testimony in their behalf in the interests of a fair trial. The statute thus operates in an area which has been held to be a fundamental and essential element to a fair trial. Washington v. Texas, 388 US 14 (1967).

 We, therefore, find that the court erred in denying certification under the Rendition Act. We are not able to say, however, whether the error was prejudicial or harmless. The issuance of certificate by the court below was only one of three steps that defendants' counsel recog-

nized they must make. In the event the court issued the certificate, then defendants would have to proceed in Kentucky for permission for Pankey to leave that jurisdiction. Further, defendants would then have to get Pankey on the witness stand in this court to confess, under oath, to the Belvidere crime. Under the circumstances at the time of the trial judge's action on the petition, as well as the intervening circumstances up to the time of trial, the likelihood of Pankey's testifying in the trial below is speculative.

Therefore, without reversing the conviction, we remand the case to the Circuit Court below with directions to issue the certificate and to continue the cause for a reasonable period of time within which application can be made in Kentucky for the production of Pankey. If approval is forthcoming from Kentucky and Pankey is shown to be willing to testify, we then direct the trial court to vacate its judgment of conviction and grant a new trial. Otherwise the conviction shall stand. See Greenwell v. United States, 317 F2d 108, 111 (1963).

Remanded with directions.

MORAN, P. J. and DAVIS, J., concur.