THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
SAMUEL L. SLEDGE, JR., Defendant-Appellant.

Second District   No. 2—87—0940

Opinion filed June 6, 1989.

Robert L. Rascia, of Rascia & Rascia, of Chicago, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:
Defendant, Samuel L. Sledge, Jr., appeals his convictions after a

jury trial for aggravated kidnaping (Ill. Rev. Stat. 1985, ch. 38, par. 10—1(a)(2), aggravated criminal sexual abuse (Ill. Rev. Stat. 1985, ch. 38, par. 12—16(c)(1)), unlawful restraint (Ill. Rev. Stat. 1985, ch. 38, par. 10—3(a)), and residential burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—3(a)). Defendant contends that (1) the trial court erred in denying his motion for a mistrial because the venire from which the jury was picked did not contain a fair representation of blacks; (2) the trial court erred in denying his motion for a mistrial after a witness made a reference implying that defendant had committed other crimes; (3) the trial court erred in denying defendant's motion to suppress his oral and written statements; and (4) the State did not prove him guilty of the crimes beyond a reasonable doubt. We affirm.

On October 18, 1986, the victim, a six-year-old girl, was staying at the home of Pam and Keith Bielema, where her mother's fiance, Joseph Foote, also resided. The victim went to sleep that night on a couch in the basement of that residence. The victim wore pajamas and slept with a pillow decorated by a cartoon character. In the early morning hours of October 19, 1986, the victim was awakened by a man who put the pillow over her face and carried her upstairs and out of the house. Once outside, the assailant dropped the victim onto the grass. The assailant then carried the victim to a small yellow car, placed her in the front seat, and drove to a nearby wooded area. The assailant told the victim to remove her clothing and subsequently touched the victim's vagina with his hand. The assailant then allowed the victim to get dressed and drove her back to the Bielema residence. The victim did not tell anyone what had occurred until the evening of October 19, 1986, when she was questioned by her mother and Foote about the grass stains on her pajamas and the whereabouts of her pillow.

On October 22, 1986, Warren Wilkosz, a detective with the Du Page County sheriff's department, met with the victim at her home. The victim described the assailant as a male black, approximately 25 years old, 5 feet 10 inches, with short, black matted-down hair, green teeth, and a pimple on the right cheek. The victim further stated that the assailant wore a hooded sweatshirt and blue jeans. Wilkosz showed the victim a series of six photographs; however, the victim was unable to identify anyone depicted in the photos. On the following day, after receiving information that defendant fit the description of the assailant, Wilkosz again met with the victim and showed her a second set of six photographs. Defendant was one of the persons depicted in the second photo lineup. The victim identified defendant as the man who removed her from the house.

On October 29, 1986, defendant was arrested by officers from the Village of Oakbrook Terrace after disobeying a traffic control device and fleeing from the police. Defendant was taken to the Oakbrook Terrace police station, where he made statements implicating himself in crimes unrelated to the instant action. Defendant was subsequently transferred to the Du Page County jail. Wilkosz learned of defendant's arrest and went to the Du Page County jail to interview him about the abduction and assault on the victim in the instant action. Wilkosz advised defendant of his rights and spoke with him for approximately one hour. During that time, Wilkosz repeatedly accused defendant of committing the kidnaping and advised him that the victim identified him from a photo lineup. Defendant subsequently implicated himself in the crimes and agreed to prepare a written statement. Defendant signed a written waiver of rights form and drafted a two-page statement that he entered the Bielema residence with the intent to commit a theft, removed the victim from the residence, transported her to a nearby field, touched her vagina, intended to rape her but changed his mind, and transported her back to the Bielema residence. Defendant subsequently signed the written statement. No other witnesses were present during this interview, and no recordings were made at the time.

On November 12, 1986, defendant was charged in a four-count indictment with the offenses of aggravated kidnaping, aggravated criminal sexual abuse, unlawful restraint, and residential burglary. Prior to the trial on those charges, defendant moved to suppress his oral and written statements. Officer Wesley Galavan of the Oakbrook Terrace police department described defendant's initial arrest. Galavan stated that defendant was advised of his rights and voluntarily gave a written statement implicating himself in crimes unrelated to the instant action. Galavan further stated that defendant did not ask for an attorney at any time and was not threatened or abused in any way. Detective Wilkosz testified that he subsequently interviewed defendant at the jail. Wilkosz stated that he advised defendant of his rights and told him that he wanted to talk about the kidnaping of a little girl in Villa Park. Wilkosz further stated that he told defendant that the victim identified him from a photo lineup, and after initially denying involvement, defendant admitted committing the crimes. Defendant subsequently prepared and signed the written statement. Wilkosz testified that defendant never asked for an attorney and was not threatened, beaten, or told that things would go better for him if he confessed.

Karen and David Eyer witnessed defendant's initial arrest and

testified on his behalf. Karen Eyer stated that she saw defendant hit his head as the officers were putting him in the car. She further testified that she did not see the officers hit defendant or verbally threaten him. David Eyer similarly testified that he did not hear any of the officers threaten defendant but stated that he saw the police officers "drag" defendant to the police car. On cross-examination, David Eyer testified that defendant was upright at all times. Defendant's father also observed defendant's arrest and testified that he saw one of the officers hit defendant in the head as he was placed in the squad car. Defendant's father could not remember what part of defendant's head was hit or if the officer used his open hand or a fist. Defendant's father further testified that he did not hear any of the officers threaten defendant. All of defendant's witnesses testified that the officers would not tell defendant's father where they were taking defendant.

Defendant testified that he was physically and verbally abused during his arrest. Defendant stated that one of the arresting officers put a gun to his head while another repeatedly hit him in the stomach and side. Defendant testified that none of the officers hit him while he was being placed in the car but one of the officers "slammed" his head in the side of the car. Defendant further testified that he was verbally and physically abused at the Oakbrook Terrace police station and that an officer threatened to shock him with a stun gun unless he made a statement. Defendant stated that he asked for and was denied an attorney and subsequently made a statement before being transferred to the Du Page County jail. Defendant further testified that he requested an attorney when talking to Wilkosz and denied any involvement with the crimes in the instant action. According to defendant, Wilkosz told him that things would go easier on him if he spoke to Wilkosz first. Defendant further testified that Wilkosz told him the details of the crimes before he prepared the written statement.

Wilkosz and officers from the Oakbrook Terrace police department were called as rebuttal witnesses and denied defendant's allegations of physical and verbal abuse or that defendant requested an attorney at any time. However, one of the officers testified that the Oakbrook Terrace police department did equip officers with stun guns. The trial court denied defendant's motion to suppress and ruled that the testimony of the various police officers was more credible than the testimony of defendant and defendant's witnesses.

Defendant also moved to quash his arrest and suppress the identification evidence. Defendant asserted that the arrest was improper and that the photo lineup was suggestive in that defendant's photo

portrayed him in a sweatshirt. With respect to the arrest, Wilkosz testified that he did not arrest defendant prior to October 29, 1986, because he wanted to continue the investigation to gather additional evidence. Wilkosz stated that he arrested defendant because defendant's voluntary statement corroborated the victim's identification. The trial court subsequently denied defendant's motion to quash arrest.

With respect to the identification evidence, Wilkosz described the procedure he used in conducting the photo lineups, but denied that defendant's photo portrayed him in a sweatshirt. Wilkosz testified that defendant was depicted in the photo lineup as wearing a high-collared jogging suit that zipped up in the front. The victim also testified at the hearing after the court made an initial finding of competency. The victim stated that the first photo lineup consisted of white people, and the second photo lineup consisted of black people. Although she remembered picking someone out of the second lineup, she could not remember why. The victim was then shown the lineups again, both consisting of blacks. Although she did not recognize anyone in the first lineup, she picked defendant's photo out of the second lineup and stated that he was the man who removed her from the Bielema residence. The trial court subsequently denied defendant's motion to suppress the identification, noting that defendant's photo appeared to depict him in a high collar and not a hooded sweatshirt.

At the beginning of the trial, defendant objected to the panel of jurors brought to the court indicating that, of the 30 prospective jurors, 29 were Caucasian and one was Hispanic. Defendant made an oral motion to discharge the panel. The trial court noted that unless defendant presented evidence indicating that the selection process was tainted, it would be presumed random. The court granted defendant leave to call the jury commissioner and proceeded with jury selection. After the jury was picked and sworn in, defendant tendered Muriel Turner, the acting jury commissioner, and questioned her concerning the method of calling persons for jury service. Turner stated that prospective jurors were summoned on a randomly selected basis from the voter registration list. Turner further stated that there was no way to tell a person's race from the list. Turner guessed that approximately 80 jurors were called to the courthouse each day Monday through Thursday, and of those, between four and eight per week were black. Of the jurors summoned to the courthouse, panels of 24 were randomly assigned to courtrooms. Turner did not know what percentage of Du Page County was black. On the basis of Turner's testimony, defendant moved for a mistrial contending that he was not getting a jury of his peers. Defendant's motion was denied, and the

case continued to trial.

In addition to the above-stated facts, other evidence introduced at trial included the victim's in-court identification of defendant as the man who took her from the Bielema residence on October 19, 1986. On cross-examination, the victim stated that it was dark in the room when she was awakened by defendant and that he put a pillow over her face. The victim could not recall her testimony from the motion to suppress the identification, nor was she able to determine the correct date of her former testimony. In addition, the victim could not recall the details of her interview with the police. Detective Wilkosz testified that a doctor's examination of the victim indicated that she did not suffer any trauma to the vaginal area. Wilkosz also indicated that a yellow car was never recovered and defendant's fingerprints were not found at the scene. However, the victim's pillow was found in a nearby wooded area.

Defendant presented an alibi defense. Defendant's father testified that on October 18, 1986, he was at his sister's house in Chicago, Illinois, at approximately 3:30 to 4:50 p.m., and observed defendant arrive at that location along with three companions. Defendant's father testified that defendant and his companions arrived in defendant's 1978 Pontiac Lemans. Defendant's father stated that he did not see his son for the next couple of days.

A.D. Thomas testified that on October 18, 1986, he accompanied defendant and two other companions to the south side of Chicago where they celebrated a birthday for defendant's father at the home of defendant's aunt. According to Thomas, he, defendant and their two companions left defendant's aunt's house and drove to Indianapolis, Indiana. During the trip to Indiana, defendant's car developed mechanical problems. Defendant took the car to an automobile repair shop in Indianapolis. The car was at the shop from the evening of October 18, 1986, through October 20, 1986. During that time, defendant remained with Thomas in Indiana. The parties returned to Chicago on October 20, 1986.

Lemuel Mills testified that he was an employee of T's Car Care, Inc., in Indianapolis, Indiana. Mills identified an automobile repair receipt belonging to defendant's father as a copy of a receipt issued by T's Car Care. The receipt listed Samuel Sledge as the customer and was dated October 18, 1986. The receipt further indicated that the vehicle, a 1978 Pontiac Lemans, was picked up and paid for on October 20, 1986. The repair bill, totaling $443.55, was paid in cash. Mills could not identify defendant as the customer.

On July 23, 1987, the jury returned guilty verdicts on all four

charges and the trial court entered judgment on those verdicts. The trial court continued the cause to September 2, 1987, for post-trial motions and sentencing. The trial court denied defendant's motion for a new trial, and defendant brought this timely appeal.

Defendant first contends that the trial court erred in denying his motion for a mistrial on the basis that the method of selecting jurors in Du Page County denied defendant a jury of his peers in violation of his fifth, sixth, and fourteenth amendment rights. We disagree.

■■ Initially, although the State does not raise waiver on this basis, we note that defendant appears to have waived this argument by virtue of having failed to file a written motion to discharge the jury panel pursuant to section 114—3 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 114—3). Section 114—3 provides that any objection to the manner in which a jury panel has been selected or drawn shall be raised by a motion to discharge the jury panel prior to the *voir dire* examination. (Ill. Rev. Stat. 1987, ch. 38, par. 114—3(a).) That section further provides that "[t]he motion shall be in writing supported by affidavit and shall state facts which show that the jury panel was improperly selected or drawn." (Ill. Rev. Stat. 1987, ch. 38, par. 114—3(b).) Objections to jury panels which are not in writing and supported by affidavit are insufficient and properly denied on that basis. *People v. White* (1985), 134 Ill. App. 3d 262, 293; *People v. Flowers* (1985), 132 Ill. App. 3d 939, 942; see *People v. Perry* (1980), 81 Ill. App. 3d 422, 428.

In the instant action, defendant made an *oral* motion to discharge the panel and therefore did not raise a proper objection. We nonetheless note that the trial court received evidence of venire selection after defendant's jury was chosen and sworn in. Even assuming that defendant's subsequent motion for a mistrial after presenting this evidence was a proper manner in which to challenge the jury panel, defendant's contention must still fail.

With respect to his sixth amendment challenge, defendant argues that the Du Page County system of calling jurors from the voter registration list systematically underrepresents blacks and other minorities and deprived defendant of his right to have a jury drawn from a fair cross-section of the community. We disagree.

■■ ■ The sixth amendment of the United States Constitution requires that a petit jury be drawn from a fair cross-section of the community. (*Taylor v. Louisiana* (1975), 419 U.S. 522, 528, 42 L. Ed. 2d 690, 697, 95 S. Ct. 692, 697.) In order to establish a *prima facie* violation of the fair–cross-section requirement, the defendant must show that (1) the group alleged to be excluded is a "distinctive" group in

the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to the systematic exclusion of this group in the jury selection process. (*Duren v. Missouri* (1979), 439 U.S. 357, 364, 58 L. Ed. 2d 579, 587, 99 S. Ct. 664, 668; see *People v. Broadnax* (1988), 177 Ill. App. 3d 818, 827.) Once the defendant has made a *prima facie* showing of an infringement of his constitutional right to a jury drawn from a fair cross-section of the community, the burden shifts to the State to demonstrate that a significant State interest is advanced by those aspects of the selection process that result in a disproportionate exclusion of the distinctive group. (*Duren*, 439 U.S. at 367-68, 58 L. Ed. 2d at 589, 99 S. Ct. at 670; see *Broadnax*, 177 Ill. App. 3d at 827-28.) It is not enough for the State to advance merely rational grounds for the underrepresentation. *Duren*, 439 U.S. at 367, 58 L. Ed. 2d at 589, 99 S. Ct. at 670.

In the instant action, the venire from which defendant's jury was selected consisted of 29 Caucasians and one Hispanic. The State does not dispute that blacks and Hispanics constitute a distinctive group for the purposes of the *Duren* test. (See *Lockhart v. McCree* (1986), 476 U.S. 162, 175, 90 L. Ed. 2d 137, 149, 106 S. Ct. 1758, 1765-66.) Rather, the State responds to defendant's argument by contending that defendant failed to establish the second and third elements of the *Duren* test.

The second prong of *Duren* requires that defendant show that the representation of the distinctive group in venires from which panels are selected is not fair and reasonable in relation to the number of such persons in the community. (*Duren*, 439 U.S. at 364, 58 L. Ed. 2d at 587, 99 S. Ct. at 668.) In *Duren*, the defendant argued that a Missouri law permitting women to obtain an automatic exemption from service deprived him of his right to a jury chosen from a fair cross-section of the community. (439 U.S. at 360, 58 L. Ed. 2d at 584, 99 S. Ct. at 666-67.) The defendant's evidence established that 54% of the population in the county were women, while women made up only 15.5% of the weekly venires. (439 U.S. at 362-63, 58 L. Ed. 2d at 586, 99 S. Ct. at 667-68.) The court concluded that "[s]uch a gross discrepancy between the percentage of women in jury venires and the percentage of women in the community requires the conclusion that women were not fairly represented in the source from which petit juries were drawn." 439 U.S. at 366, 58 L. Ed. 2d at 588, 99 S. Ct. at 669.

In the instant action, defendant elicited testimony from Muriel

Turner, the acting jury commissioner for Du Page County, establishing that approximately 320 jurors were randomly selected from a voter registration list and summoned to the courthouse each week. Of those, Turner opined that four to eight were black. Unlike *Duren*, defendant did not present any evidence establishing the population of blacks in Du Page County. Although defendant's appellate brief states that 1.2% of Du Page County residents are black, no evidence of that figure was presented to the trial court. Thus, defendant failed to establish a *prima facie* case by omitting evidence crucial for a determination under *Duren*.

The State also asserts that defendant did not satisfy the third prong of the *Duren* test. The third prong of *Duren* provides that defendant must show that the underrepresentation of blacks is due to their systematic exclusion in the jury selection process. (439 U.S. at 364, 58 L. Ed. 2d at 587, 99 S. Ct. at 668.) In *Duren*, the court noted that the selection system utilized allowed women to exempt themselves from the process and that the exemption was automatically exercised if the potential juror did not respond to the summons. (439 U.S. at 366-67, 58 L. Ed. 2d at 588, 99 S. Ct. at 670.) The court noted that "any category *expressly limited to a group* in the community of sufficient magnitude and distinctiveness so as to be within the fair–cross-section requirement—such as women—runs the danger of resulting in underrepresentation sufficient to constitute a *prima facie* violation of that constitutional requirement." (Emphasis added.) (439 U.S. at 370, 58 L. Ed. 2d at 590-91, 99 S. Ct. at 671.) The court concluded that defendant satisfied the third prong of the test through his "undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year." 439 U.S. at 366, 58 L. Ed. 2d at 588, 99 S. Ct. at 669.

To establish the third prong of *Duren* in the instant action, defendant notes that Turner testified that the number of blacks called for service was equal from week to week, thus indicating that the system was insufficient. Defendant argues without citation of authority that a system which calls jurors from voter registration lists has long been recognized as underrepresenting blacks. We note that selection of venires from voter registration lists is expressly authorized in Illinois by statute. (See Ill. Rev. Stat. 1987, ch. 78, par. 25.) In addition, Turner testified that there was no way to determine a person's race from this process. Thus, regardless of the accuracy of defendant's hypothesis, any "underrepresentation" of blacks would not be due to the systematic exclusion of *that group* by the process utilized. The trial court found that defendant failed to establish a *prima facie* violation

of his sixth amendment right to a jury selected from a fair cross-section of the community. Based on defendant's failure to introduce any evidence of underrepresentation or systematic exclusion, we conclude that the trial court did not err in denying defendant's motion on that basis.

Defendant also argues that the jury selection process denied him equal protection under the fourteenth amendment. We disagree.

■ It has long been recognized that the systematic exclusion of members of an identifiable group from jury service based solely on their membership in such a group denies a defendant who is a member of that group equal protection under the fourteenth amendment of the United States Constitution. (*Castaneda v. Partida* (1977), 430 U.S. 482, 492, 51 L. Ed. 2d 498, 509, 97 S. Ct. 1272, 1279; *People v. Rosa* (1982), 111 Ill. App. 3d 384, 387.) The burden of proving selective discrimination against an identifiable group is upon the defendant. (*Rosa*, 111 Ill. App. 3d at 388.) The two methods of establishing a *prima facie* case under the fourteenth amendment are (1) showing that the statutory jury selection procedure is racially nonneutral, or susceptible to abuse on its face; or (2) the "rule of exclusion," which requires a showing that, over time, an identifiable group has been substantially underrepresented in jury service in comparison with their proportionate presence in the total population of the community. (*Rosa*, 111 Ill. App. 3d at 388; see *Castaneda*, 430 U.S. at 494-95, 51 L. Ed. 2d at 510-11, 97 S. Ct. at 1280; *Broadnax*, 177 Ill. App. 3d at 830.) Once the defendant establishes a *prima facie* case of discrimination, the burden shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral criteria and procedures were employed. *Rosa*, 111 Ill. App. 3d at 388.

■ Defendant's argument in the instant action is raised under the "rule of exclusion" test. Defendant states that the "rule of exclusion" evidence was established by the testimony of the acting jury commissioner. As we noted above, defendant failed to introduce any competent evidence establishing the percentage of blacks residing in Du Page County and, thus, did not establish that blacks were underrepresented on juries in comparison with their proportionate presence in the total population of the community. In addition, the testimony of the jury commissioner indicated that approximately 1% to 4% of the weekly venires were black. Thus, even if defendant's unsupported allegation that 1.2% of Du Page County is black is correct, his own statistics defeat his claim. Accordingly, we conclude that the trial court did not err in denying defendant's motion for a mistrial on this basis.

Defendant next contends that the trial court erred in denying his

motion for a mistrial after Detective Wilkosz characterized the second photo lineup as consisting of "Du Page County booking photos." Defendant argues that this reference prejudiced the jury by implying that defendant had a criminal record. We disagree.

■ Generally, evidence of offenses other than those for which a defendant is being tried are inadmissible. (*People v. Winfield* (1983), 113 Ill. App. 3d 818, 839.) This rule has been held to be violated by references that a defendant *was on probation* when he committed the crime charged, and by testimony concerning a defendant's statement that he did not wish to *return to prison*. (See 113 Ill. App. 3d at 839.) However, any prejudice in the presentation of such testimony is generally cured by sustaining the defendant's objection and instructing the jury to disregard the improper reference. (113 Ill. App. 3d at 839.) In such a case, the trial court has wide discretion in considering a motion for mistrial, and its decision will not be disturbed absent an abuse of discretion. (*People v. Omatto* (1980), 88 Ill. App. 3d 438, 441; see also *Winfield*, 113 Ill. App. 3d at 839.) In other words, it must be apparent that the jury was so influenced and prejudiced by the comment that it could no longer be fair and impartial. *Winfield*, 113 Ill. App. 3d at 839.

In arguing that the jury in the instant action was so influenced and prejudiced by the remark that it could not be fair and impartial, defendant cites *People v. Hudson* (1972), 7 Ill. App. 3d 333, 337, wherein the court held that introduction of a "mug shot" was error since it called the jury's attention to the defendant's previous problems with the police. However, the photograph in *Hudson* depicted defendant from three views, one of which exhibited the defendant in front of a height chart. (7 Ill. App. 3d at 337.) Moreover, the *Hudson* court noted that while the record as a whole mandated a new trial, "none of the errors in the record, *appearing singly*, would necessarily require reversal." (Emphasis added.) 7 Ill. App. 3d at 338.

A case closer on point is *People v. Moscatello* (1969), 114 Ill. App. 2d 16, 30, wherein the prosecutor characterized a photo of the defendant as a "mug shot," and the court sustained an objection to the reference and admonished the jury to disregard the characterization. On appeal, the court stated that, although the characterization was improper, it was not reversible error since the trial court promptly sustained the objection, the photo was not admitted into evidence, and no reference was made to the defendant's prior criminal record. 114 Ill. App. 2d at 30-31.

■ In the instant action, not unlike *Moscatello*, a witness characterized a photo lineup including a picture of defendant as Du Page

County booking photographs. The trial court held an extensive hearing outside the jury's presence to assess the substantive damage of the remark. Relying on *Moscatello*, the trial court admonished the jury to disregard the reference made by the witness to the type of photo used. No further references were made regarding the type of photo used or otherwise implying that defendant had a prior criminal record. From this evidence, we cannot say that the jury was so prejudiced by the remark that it deprived defendant of a fair trial. Therefore, we conclude that the trial court did not err in denying defendant's motion for a mistrial.

Defendant next contends that the trial court erred in denying his motion to suppress his oral and written statements. Defendant argues that the confession was the product of coercion. We disagree.

■■ Whether a statement is voluntarily given depends on the totality of the circumstances. (*People v. Martin* (1984), 102 Ill. 2d 412, 426-27.) The test is whether it has been made freely, voluntarily, and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. (102 Ill. 2d at 427.) The finding of the trial court on the voluntariness of a confession will not be disturbed unless it is against the manifest weight of the evidence. *People v. Davis* (1983), 95 Ill. 2d 1, 25.

In the instant action, defendant asserted that he was denied access to an attorney and was subjected to physical and verbal abuse and repeated threats from the moment of his arrest until he wrote out the confession implicating himself in the instant charges. Each of the officers involved denied defendant's allegations. The trial court denied defendant's motion to suppress, noting that the officers' credibility outweighed the witnesses presented by defendant. We will not substitute our judgment for that of the trial court in assessing the credibility of the witnesses. Indeed, the record more than adequately supports the trial court's decision.

■■ For example, defendant asserted that he was hit repeatedly by an officer at the time of his initial arrest, but his own witnesses neither saw him get hit nor heard him threatened. Defendant and his father testified that an arresting officer "slammed" or "smashed" his head on the car, but other of defendant's witnesses who watched him placed into the car did not see that event and one of those witnesses testified that defendant hit his own head. Defendant further testified that during his initial questioning one of the officers put his fingers in defendant's mouth and hit his head against the wall; however, this was not corroborated by any other witness or physical evidence. Defendant also alleged that he was threatened by an officer holding a

stun gun; however, the officers denied defendant's allegation and further stated that stun guns were not permitted in the booking area. Finally, defendant admitted that Wilkosz did not threaten him prior to obtaining his confession to the crimes for which he was charged in the instant action. Accordingly, we conclude that the trial court did not err in denying defendant's motion to suppress his confession.

Defendant next contends that he was not proved guilty of the crimes beyond a reasonable doubt. Defendant first contests the credibility of the victim's testimony and argues that the proof of his identity was not established by competent, credible evidence. We disagree.

As a general rule, an appellate court will not lightly overturn a jury's verdict and will not substitute its judgment for that of the trier of fact unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Edwards* (1984), 128 Ill. App. 3d 993, 997.) In addition, the question of a witness' competency to testify is for the trial court, and the reviewing court will not disturb that ruling unless the trial court abused its discretion or misapprehended some legal principle. (*In re A.M.C.* (1986), 148 Ill. App. 3d 775, 778.) The controlling factor in determining a child's competency is the degree of her intelligence, not her chronological age. (148 Ill. App. 3d at 778.) A child is competent to testify if she is sufficiently mature to receive correct impressions from her senses, to recollect and narrate those impressions intelligently, and to appreciate the moral duty to tell the truth. 148 Ill. App. 3d at 778.

In addition to his own confession, the evidence of defendant's identity in the instant action consisted of the victim's photo lineup and subsequent in-court identification of defendant. The trial court ruled the victim competent to testify and noted that any inconsistencies in her testimony would be a matter of weight for the jury. In challenging that evidence, defendant points to numerous inconsistencies in the victim's testimony. For example, defendant notes that the victim testified at the motion to suppress identification that the pictures in the first photo lineup were of white men. In addition, the victim could not remember certain aspects of her prior identification or testimony at the motion to suppress, the victim did not make an immediate outcry, and there was no medical evidence corroborating abuse. Defendant also makes much of the fact that during questioning on competency, the victim stated that she did not know what it meant to tell a "fib."

With respect to the court's finding of competency, we note that on both occasions that the victim testified, she not only demonstrated her ability to receive correct impressions from her senses, but also stated

that she could tell the difference between the truth and a lie and demonstrated her ability to do so. We do not consider her subsequent statement that she did not "know what it [was] to tell a lie" to be significant, especially given defendant's repeated use of the term "fib" in eliciting that statement from her.

██ With respect to defendant's remaining challenge concerning inconsistencies and weaknesses in her testimony, the trial court correctly noted that such inconsistencies would be a matter of credibility and weight for the jury. (See *In re A.M.C.*, 148 Ill. App. 3d at 779.) Defendant was not precluded from highlighting those weaknesses. After examining the record as a whole, we do not find the evidence so improbable as to raise a reasonable doubt of guilt and we will not substitute our judgment for that of the jury.

Defendant next argues that he was not proved guilty of residential burglary beyond a reasonable doubt. Defendant contends that the State failed to present evidence establishing that defendant entered the Bielema residence with the intent to commit a theft. We disagree.

██ ██ A person commits residential burglary when he knowingly and without authority enters the dwelling place of another with the intent to commit a felony or theft. (Ill. Rev. Stat. 1985, ch. 38, par. 19—3(a).) Evidence of defendant's intent when he entered the Bielema residence and kidnaped the victim was established by evidence of his oral and written statements that he intended to enter the premises to see if he could find a wallet or purse lying around. Defendant attacks this evidence by arguing that the statements were coerced. However, as we noted above, the trial court properly rejected defendant's attempt to have his statements suppressed on that basis. Although defendant notes without argument that the jury had some question regarding the authorship of the written statement, defendant never challenged the State's assertion that he was the author, and defendant himself testified that he prepared the statement. Accordingly, we conclude that the record supports defendant's conviction for residential burglary.

For all of the reasons set forth above, defendant's convictions are affirmed.

Affirmed.

UNVERZAGT, P.J., and LINDBERG, J., concur.