(Nos. 63896, 64408 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CHARLES ALBANESE, Appellant.

*Opinion filed September 29, 1988.—Rehearing denied December 5, 1988.*

STAMOS, J., took no part.

Jed Stone and Susan Valentine, of Jed Stone, Ltd., of Waukegan, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Terence M. Madsen and Jack Donatelli, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

The defendant, Charles Albanese, filed petitions under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1985, ch. 38, par. 122–1 *et seq.*) challenging separate murder convictions in McHenry and Lake Counties. Charles Albanese was tried and convicted in the circuit court of McLean County for the 1980 murders of his father and his wife's grandmother and the attempted murder of his brother. The trial had been transferred to McLean County from McHenry County. A jury sentenced him to death. This court affirmed the conviction and sentence. (*People v. Albanese* (1984), 102 Ill. 2d 54 (*Albanese I*).) The United State Supreme Court denied *certiorari*. (*Albanese v. Illinois* (1984), 469 U.S. 892, 83 L. Ed. 2d 205, 105 S. Ct. 268.) His McHenry County post-conviction petition was denied by the circuit court following a full evidentiary hearing. Charles Albanese was also tried and convicted in the circuit court of Lake County for the 1980 murder of his mother-in-law. The trial judge sentenced him to death. This court affirmed that conviction and sentence. (*People*

*v. Albanese* (1984), 104 Ill. 2d 504 (*Albanese II*).) The United States Supreme Court denied *certiorari*. (*Albanese v. Illinois* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.) The Lake County post-conviction petition was denied without an evidentiary hearing. Both post-conviction petitions were appealed directly to this court under Supreme Court Rule 651 (107 Ill. 2d R. 651) and were consolidated due to the similarity of issues presented for consideration.

Five issues are presented by the defendant for review: (1) whether he was denied effective assistance of counsel at each trial; (2) whether he was denied effective assistance of counsel at each sentencing hearing; (3) whether recent evidentiary discoveries render scientific evidence admitted during the trials unreliable; (4) whether the Lake County circuit court erred in denying the post-conviction petition without an evidentiary hearing; and (5) whether the Illinois death penalty statute is applied in a racially discriminatory manner and is therefore unconstitutional.

The factual background of each case was presented at length in each of the direct appeals (*Albanese I* and *Albanese II*), and we will therefore discuss only those facts relevant to the issues before our court for review. Briefly, however, Charles Albanese was convicted of murdering and attempting to murder, by the use of arsenic, members of his and his wife's families for the purpose of financial gain.

A Post-Conviction Hearing Act proceeding is not an appeal *per se*, but a collateral attack on a judgment. (*People v. James* (1986), 111 Ill. 2d 283, 290.) That is to say, the defendant's guilt or innocence is not at issue; rather, a post-conviction hearing is a proceeding "meant to delve into the constitutional phases of the original conviction which have not previously been determined." (*People v. Gaines* (1984), 105 Ill. 2d 79, 87.) The burden

is on the defendant to establish a substantial constitutional deprivation. (*People v. Silagy* (1987), 116 Ill. 2d 357, 365; *People v. Griffin* (1985), 109 Ill. 2d 293, 303.) A defendant is not entitled to a post-conviction hearing as a matter of right, but only when the allegation of a substantial violation of constitutional rights is supported by the record or by accompanying affidavits. (*People v. Silagy* (1987), 116 Ill. 2d 357, 365; *People v. Gaines* (1984), 105 Ill. 2d 79, 91-92.) Determinations of the reviewing court on the prior direct appeal are *res judicata* as to issues actually decided and issues that could have been presented on direct appeal and that were not are deemed waived. *Silagy*, 116 Ill. 2d at 365.

For purposes of this review, we are combining our discussion of the defendant's assistance-of-counsel claims. The defendant contends that he was denied effective assistance of counsel both at the trial and at the sentencing phase of the proceedings in both counties. This court squarely dealt with the issue of effective assistance of counsel at the Lake County trial in *Albanese II*, in which we specifically adopted the Supreme Court's rule for challenges to effectiveness of counsel enunciated in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. (104 Ill. 2d at 526.) Because *Albanese II* addressed the very issue of the effectiveness of counsel at the trial in the Lake County proceeding it is now *res judicata* (*People v. Gaines* (1984), 105 Ill. 2d 79); subsequent addition of somewhat different allegations of incompetence cannot now be raised in this petition as to the Lake County trial. This court has not, however, specifically reviewed the ineffective-assistance-of-counsel allegations for either phase of the McHenry County proceedings or for the sentencing phase of the Lake County trial. Normally, at this point in the proceedings consideration of these issues would be barred based on the theory of waiver; issues that could have been

raised on the direct appeal to this court and were not are waived. (*People v. Silagy* (1987), 116 Ill. 2d 357, 365; *People v. Kubat* (1986), 114 Ill. 2d 424, 436.) However, we have held in the past that "[the] principle of waiver *** will not be applied in post-conviction proceedings where fundamental fairness so requires." *People v. Cihlar* (1986), 111 Ill. 2d 212, 218.

We therefore turn now to an application of the *Strickland* standard to those phases not previously reviewed by this court to determine if defendant has made a case for ineffective assistance of counsel. *Strickland* advances a two-component standard. The first component is to prove that counsel's representation fell below an objective standard of reasonableness such that the trial results were unreliable. Under the second component, the defendant must prove that he was prejudiced by the unprofessional conduct; that is, he must show that, but for the attorney's unprofessional errors, the results of the trial would have been different. (*Strickland*, 466 U.S. at 687, 694, 80 L. Ed. 2d at 693, 698, 104 S. Ct. at 2064, 2068.) However, as an assistance to other courts, the Supreme Court has offered the following guideline:

> "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.)

The question we must answer, then, is, Does defendant's claim of ineffectiveness present an indication that he suffered sufficient prejudice to overturn the trial results? We find that there was no such prejudice.

As noted in *Strickland*, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.) Trial errors that the defendant alleges in this post-conviction proceeding include the following: that defendant's trial attorney was ill-prepared for trial; that he prepared for trial in less than one month; that he did not speak to enough or the right expert witnesses; that he did not properly cross-examine the State's witnesses; that he failed to reasonably investigate the toxicology reports or the lab that performed the tests; that he failed to rebut certain of the State's evidence regarding the date of delivery of arsenic to the defendant; and that he failed to accurately present the defendant's financial condition. Errors that the defendant alleges occurred in the sentencing phase include the following: that he failed to adequately "humanize" the defendant at the sentencing hearing; that he did not call certain character mitigation witnesses; and that he did not produce evidence of his good high school or college record.

Under the Supreme Court guidelines, we look first to the component of prejudice. In order to determine if prejudice exists, we must consider whether, if defendant's trial counsel did commit all of the errors alleged, the defendant was prejudiced; that is, would the results or decision of the jury have been different had the alleged errors not been committed. We find that even if we accept the defendant's contention that his attorney did commit each and every one of the indicated errors, he was not prejudiced by them, either singly or in their totality. The uncontroverted evidence against Charles Albanese is strong enough to support the conviction even if we were to accept that his attorney's actions or inactions constituted error. For example, it is undisputed that the defend-

ant possessed arsenic at the time of the victim's deaths, and arguments about the date of delivery could not change that fact; there is no dispute that as a result of the deaths the defendant experienced financial gains that eased a financially tight situation, and moving numbers from one side of the ledger to another could not have altered that fact; additionally, there is no dispute that witnesses did appear on behalf of Charles Albanese at the sentencing phase of the trial, that their input was taken into consideration by the judges and/or the jury and cumulative testimony could not have added anything new.

Although we are not required to review the case further under the Supreme Court's guidelines, we note that our review of the record indicates only that Charles Albanese's present attorney would have handled the trials somewhat differently. Defendant's brief concedes that trial strategy is not subject to review; our decisions have held that errors in judgment or trial strategy do not establish incompetence (*People v. Gaines* (1984), 105 Ill. 2d 79, 95, quoting *People v. Eddmonds* (1984), 101 Ill. 2d 44, 70), yet he persists in challenging the attorney's performance based on his apparent belief that a different strategy should have been used. Trial performance is not to be judged by a hindsight perspective. (*Strickland v. Washington* (1984), 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2065.) The record indicates that defendant's attorney had a criminal trial background, that he did contact and discuss the case with experts, that he presented expert witness testimony at the trials, that he did humanize Mr. Albanese at the sentencing portion of the trial and in fact protected him from having aggravating evidence admitted, and that he made various strategic decisions regarding how to proceed with the trial.

Finally, we also note that defendant had a full postconviction evidentiary hearing in McHenry County in which the issue of ineffective assistance was presented.

The circuit court found that the petitioner failed to establish ineffective representation by trial counsel. The court found that defendant's case was based upon speculation, conjecture and second-guessing. That court's review of the record found that the petitioner's attorney was an experienced criminal law trial attorney who had made reasonable investigation and preparation under the circumstances and who provided representation that adequately made the adversarial testing process work. The court concluded that the fact that the result was unsatisfactory to the petitioner did not make the representation ineffective. Determinations by the trial judge will not be disturbed unless manifestly erroneous (*People v. Griffin* (1985), 109 Ill. 2d 293, 303), and the defendant has not met that burden. After reviewing the record, we agree with the circuit court's determination as to the proceedings it reviewed. We find that defendant was not denied effective assistance of counsel at either phase of the Lake County or the McHenry County trials.

We next turn to defendant's allegations that recent evidentiary discoveries render scientific evidence admitted during the trials unreliable. Specifically, defendant contends that the 1985 closing of the Illinois Department of Public Health Toxicology Laboratory because of various serious inadequacies makes analysis for arsenic poisoning done by the lab in 1981 on the three murder victims unreliable. The State's case, the defendant contends, centered on this false and unreliable scientific analysis, and the reviewing court should now accept this "new evidence" and grant defendant a new trial.

To begin our analysis of this argument, we first note that the Post-Conviction Hearing Act specifies that the petitioner must "clearly set forth the respects in which petitioner's constitutional rights were violated. The petition shall have attached thereto affidavits, records, or other evidence supporting its allegations ***." (Ill. Rev.

Stat. 1985, ch. 38, par. 122—2.) Additionally, "[t]he [trial] court may receive proof by affidavits, depositions, oral testimony, or other evidence." (Ill. Rev. Stat. 1985, ch. 38, par. 122—6.) Proof or verification of the closing of the toxicology lab or of its allegedly unprofessional workmanship was never accepted as substantive evidence before the trial court in the McHenry County proceeding. Instead, various reports about the lab were made a part of the record only for the purpose of preservation of the record to indicate the type of information upon which an expert witness had relied in reaching an opinion. These reports, preserved in the record in such manner, included copies of the Director of Public Health Thomas Kirkpatrick, Jr.'s March 26, 1985, report, the Chemical Toxicology Institute Director Randall C. Baselt's May 24, 1985, report, and the St. Louis University Medical Center School of Medicine, Division of Forensic and Environmental Pathology Director Alphonse Poklis' April 3, 1986, report. The last report named above was done at the request of defendant's counsel, while the first two were undertaken as part of a State investigation of the toxicological laboratory. No witnesses or affidavits were proffered to vouch for the authenticity, truthfulness or accuracy of any of these reports. The State contends that the defendant has failed to come forward with the kind of evidence necessary to support his claims of unreliable or false evidence. However, the testimony of the State's own witness, Dr. Conibear, at the post-conviction hearing in McHenry County, put into the record during cross-examination her opinion that the lab had experienced "problems" at the time of the defendant's trial. The allegation is a serious one and warrants our court's review to assure that the defendant did indeed receive a fair trial. Our review did incorporate a study of the Kirkpatrick, Baselt and Poklis reports and, additionally, we took note of the fact that the toxicology laboratory was closed in 1985.

Would this information, if taken as new substantive evidence to be admitted for its truth and accuracy, warrant a new trial for the defendant? We find that it would not.

The standard for a new trial based on the discovery of new evidence is discussed in *People v. Molstad* (1984), 101 Ill. 2d 128, 134, which quotes *People v. Baker* (1959), 16 Ill. 2d 364, where this court noted:

> "To warrant a new trial, the new evidence must be of such conclusive character that it will probably change the result on retrial, that it must be material to the issue but not merely cumulative, and that it must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence." (16 Ill. 2d at 374.)

While the above-named reports and the closing of the lab were not discoverable before the trial, problems with lab procedures might have been difficult for a nontechnician or a nonscientist to discover, and the reliability of the tests could be considered material, we do not find that any of the information—even assuming, for the sake of review, its truth and accuracy—is "of such *conclusive character* that it will probably change the result on retrial." (Emphasis added.) 16 Ill. 2d at 374.

The tests to disclose levels of arsenic utilized by the State in the Albanese trials were performed by the lab in 1981. The problems, studies, and reports which culminated in the closing of the lab occurred in 1985. A complete review of the reports gave no indication or suggestion that the lab was experiencing extensive or grave problems as far back as 1981, and we will not presume or assume that problems uncovered in 1985 necessarily existed four years earlier. We note also that the reference during the McHenry County post-conviction hearing testimony of Dr. Conibear to "problems" at the lab was tempered by the accompanied admission that she was unfamiliar with the lab's procedures, equipment, or

methods and that she was not familiar with the methodology used in determining levels of arsenic poisoning. Additionally, we note that while the proffered reports do indicate the problems found in 1984 and 1985, they provide other evidence that the lab was functioning adequately in 1981. A report included in defendant's brief, "Toxicology Final Report," notes at page 34 that "[t]he most consistent analytical errors made by the Illinois Department of Public Health Toxicology Laboratory occurred in blood alcohol analysis." Yet, Dr. Baselt's report, which ultimately recommended the closing of the lab, noted that "[r]eview of quarterly U.S. Department of Transportation Blood Alcohol Survey results for the period September, 1972 to October, 1984 indicate that the laboratory performed very well" and then went on to note the progressive development of problems during 1984 and 1985. These reports indicate that an area of scientific analysis which was found by the State to have experienced the most problems in 1985 appears to have been experiencing few problems in 1981. Finally, we also note that Dr. Baselt's report made no mention of the Albanese case, though it did make specific mention of another arsenic-poisoning case. We will not stretch these findings to now include what they originally did not include based on defendant's mere conjecture.

Thus, even taking note of the reports and acknowledging that the lab was closed in 1985, defendant has not produced evidence which would convince us that the conditions which existed in 1985 requiring the closing of the lab were present four years earlier when the lab performed the Albanese tests.

Even if we were to assume, however, for the sake of argument, that the test results were questionable or unreliable, we do not believe that that fact would warrant a new trial in this case. As defendant properly notes, the case against him was essentially a circumstantial one. No

one piece of evidence was central to the State's case against Charles Albanese; it was, rather, the cumulative effect which convinced the juries of Mr. Albanese's guilt and which supported our affirmances in *Albanese I* and *Albanese II*. Our court and the lower courts on retrial would still be left with all of the other facts presented: that Mr. Albanese had obtained arsenic and that he at one point lied to the police about possessing arsenic; that the noted symptoms of the three murder victims coincide with known symptoms of lethal and sublethal arsenic poisoning; that the symptoms of the victim of attempted murder evidence sublethal doses of arsenic; that the defendant was experiencing financial problems (at the very least he was in arrears on mortgage and child support payments) that were eased by receipt of funds from the estates of the victims; that the defendant used his position in the family company to defraud the company and his family in order to obtain additional funds after the death of his father and during the incapacitating illness of his brother; further, that he attempted on two occasions to hire others to kill his brother and his brother's wife; that he authored and sent anonymous letters attempting to implicate his brother as the murderer. The point to be made here is that the tests from the lab were not the pivotal linchpin in the State's case against Mr. Albanese, they were merely one of several links in the chain of circumstantial evidence. As we have already noted in *Albanese II*, a conviction can be sustained on circumstantial evidence. (104 Ill. 2d at 514.) Our court has also held that "the trier of fact does not have to be satisfied beyond a reasonable doubt as to each link in the chain of circumstantial evidence; it is sufficient if all the evidence, taken together, satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *People v. Hall* (1986), 114 Ill. 2d 376, 409.

In closing our review on this issue, we found no case exactly on point with the case at bar; however, one somewhat analogous case was this court's decision in *People v. Cornille* (1983), 95 Ill. 2d 497. *Cornille* involved a remand for new trial based on discovery of the fact that a State's expert witness in an arson trial had perjured himself regarding his academic credentials. This fact was discovered two years after the conviction of the defendant. In granting the defendant a new trial, our court noted that the expert witness' testimony had been crucial to the case—in essence, resolution of the case depended on which expert presented to the jury was more believable, the State's or the defendant's. *Cornille* did not present the more oft seen example of a defendant presenting new evidence of questionable reliability; instead it presented a case where the expert witness had unquestionably committed perjury in the defendant's case and had already been convicted of such. We noted that "[i]t is antithetical to our system of justice to refuse to grant a new trial for a defendant when it is convincingly established that he was convicted on the basis of false testimony." (95 Ill. 2d at 507.) There are some similarities between the results of the lab tests offered in Albanese's trial (which the defendant in essence alleges were false) and the testimony of the expert witness in *Cornille* in that both the test results from a State lab and the expert witness are expected to be true and reliable sources of information to assist the average lay person on the jury to reach a credible and just decision. However, there the similarity ends, for the case at bar falls far short of the *certainty* of "false testimony" found in *Cornille*. The defendant has simply not convinced this court that the lab results offered in his trials were false or unreliable testimony.

Having examined the defendant's third proffered issue from various angles, we find that the recent "evi-

dentiary discoveries," *i.e.*, the circumstances and conditions leading to the closing of the lab, do not substantiate his contention that scientific evidence offered during his trials was unreliable.

Defendant next contends that Lake County erred in denying his post-conviction petition without an evidentiary hearing. It is well established that a post-conviction petitioner is not entitled to an evidentiary hearing as a matter of right. (Ill. Rev. Stat. 1985, ch. 38, par. 122—6; *People v. Silagy* (1987), 116 Ill. 2d 357, 365; *People v. James* (1986), 111 Ill. 2d 283, 291.) A hearing need be conducted only when the petitioner, his allegations supported by the record in the case or by accompanying affidavits, makes a substantial showing of a violation of his constitutional rights. (*Silagy*, 116 Ill. 2d at 365; *People v. Gaines* (1984), 105 Ill. 2d 79, 92; *People v. Curtis* (1971), 48 Ill. 2d 25, 27.) We agree with the Lake County circuit court that defendant has failed to make that "substantial showing." Both the ineffective-assistance-of-counsel allegations and the new-scientific-evidentiary-discoveries allegation have been discussed at length in this opinion, and we find that the defendant has not made a showing of a constitutional deprivation of his rights. The defendant's final contention regarding the unconstitutionality of the death penalty will be addressed next.

Lastly, defendant contends that the Illinois death penalty statute is unconstitutional because it is applied in a racially discriminatory manner. Defendant bases this allegation on the results of a statistical study published in the Stanford Law Review which show that a suspect accused of killing a white victim in Illinois is four times more likely to receive the death penalty than is a suspect accused of killing a black. (See Gross & Mauro, *Patterns of Death: An Analysis of Racial Disparities in Capital Sentencing & Homicide Victimization*, 37 Stan. L. Rev. 27 (1984).) This issue and study were fully discussed in

two of our recent decisions in which we held that "defendant[s] cannot make a substantial showing of a violation of *** constitutional rights based on the Gross study." (*People v. Stewart* (1988), 121 Ill. 2d 93, 107; see also *People v. Davis* (1987), 119 Ill. 2d 61, 65.) While those decisions involved black defendants accused of murdering white victims, we see no reason to again discuss this issue in a case where a white defendant is convicted of killing a white victim. Additionally, we note that our decisions are in full accord with the Supreme Court's holding in *McClesky v. Kemp* (1987), 481 U.S. 279, 95 L. Ed. 2d 262, 107 S. Ct. 1756.

For the reasons stated herein, the McHenry County circuit court's denial and the Lake County circuit court's dismissal of defendant's post-conviction petitions are affirmed. The clerk of this court is directed to enter an order fixing Wednesday, January 25, 1989, as the date on which the sentence of death entered in each circuit court shall be executed at the Stateville Correctional Center at Joliet. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of this order shall be furnished by the clerk of this court to the Director of Corrections and to the wardens of the Illinois State penitentiaries at Menard and Joliet.

*No. 63896 — Affirmed.*
*No. 64408 — Affirmed.*

JUSTICE STAMOS took no part in the consideration or decision of this case.