THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES SAUNDERS, Defendant-Appellant.

Second District   No. 2—87—0728

Opinion filed August 31, 1989.—Rehearing denied October 6, 1989.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Michael J. Pelletier and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

Defendant, James Saunders, appeals from an order of the circuit court of Winnebago County which dismissed his amended petition for post-conviction relief. On appeal, defendant contends that the trial court erred in not holding an evidentiary hearing on his petition given that he alleged that (1) a recent evidentiary discovery showed that the State used unreliable scientific evidence at his trial; and (2) the absence of black persons from the jury venire deprived him of his right to be tried by a jury selected from a fair cross-section of the community. We affirm.

In January 1982, defendant was charged with home invasion (Ill. Rev. Stat. 1981, ch. 38, par. 12—11), rape (Ill. Rev. Stat. 1981, ch. 38, par. 11—1), and deviate sexual assault (Ill. Rev. Stat. 1981, ch. 38, par. 11—3). Following a jury trial, defendant was found guilty of all three offenses and was sentenced to concurrent terms of 40 years' imprisonment. Defendant took a direct appeal to this court (*People v. Saunders* (1984), 122 Ill. App. 3d 922), which affirmed his convictions.

On April 3, 1987, defendant filed an amended *pro se* petition for post-conviction relief pursuant to the Post-Conviction Hearing Act (Ill. Rev. Stat. 1987, ch. 38, par. 122—1 *et seq.*). In the petition, defendant alleged that he was denied effective assistance of counsel, both at trial and on direct appeal, that he was not proved guilty beyond a reasonable doubt, that the State used unreliable scientific evidence at his trial, and that he was denied his right to a jury representing a fair cross-section of the community. On June 5, 1987, the State filed a motion to dismiss defendant's petition, alleging that defendant's allegations in the petition were either vague or waived. On July 24, 1987, the trial court granted the State's motion to dismiss defendant's petition. Defendant filed a timely notice of appeal.

The evidence adduced at defendant's trial showed that on the morning of January 12, 1982, defendant knocked on the victim's door

and showed the victim a postcard after she opened the door. Defendant asked the victim if the card was hers, but before she could answer, defendant struck her in the face with his fist. Defendant entered the victim's apartment and pushed her into the bedroom. Defendant proceeded to throw her onto the bed and cut off her clothing with a knife. Defendant then used an electrical cord to tie her wrists together and bind her to the bed. Defendant then repeatedly beat and raped the victim and forced her to perform fellatio on him. Defendant also forced the victim into the bathroom, had her lie down in the bathtub, and urinated on her face.

One of the victim's neighbors heard someone screaming in the apartment building and went to the victim's apartment. The neighbor knocked on the victim's door but received no response. However, she did notice that the victim's car engine was running in the parking lot and decided to call the police. The police arrived at the victim's apartment and began to knock on the front door. After approximately 10 minutes of knocking on the door, one officer received permission from his supervisor to enter the victim's apartment through a window. As the officer was doing so, defendant opened the front door of the apartment and shouted "emergency." Defendant was arrested, and the police officers entered the apartment and found the victim in the bedroom. The victim was lying on the bed in the nude, crying, and her face was covered with blood.

Defendant testified at trial that he was under the influence of alcohol, marijuana, and psilocybin (a hallucinogen) while he was at the victim's apartment. Furthermore, defendant stated that the victim consented to the sexual activity. Defendant testified that he had an ongoing sexual relationship with the victim and had had sex with her on four or five previous occasions. Defendant stated that the victim would pay him money to participate in her sexual fantasies involving bondage. However, the victim did not have any money to pay defendant after he participated in the sexual activity on the date in question. According to defendant, he became angry when the victim did not pay him for engaging in the sexual activity with her. Defendant stated that he hit the victim in the face, and she fell onto the bathroom floor. Defendant further stated that the victim aggravated her injuries when she hit her head on the fixtures in the bathroom.

One aspect of defendant's defense at trial concerned the victim's alleged use of the drug dimethyltryptamine (DMT), a controlled substance. (See Ill. Rev. Stat. 1981, ch. 56½, par. 1204(d)(6).) Emmett Harmon, a toxicologist and clinical chemist, testified that he performed a drug screen on a sample of the victim's blood. Harmon

stated that he detected a "very sizable quantity" of DMT in the victim's blood sample. Harmon stated that it was not natural to find DMT in a person's blood, and that it would have to be artificially placed into a person's body for it to show up in the blood on a drug screen.

Dr. Carl Hamann, a psychiatrist, testified that DMT is a hallucinogen and is similar to LSD. Dr. Hamann stated that an individual under the influence of DMT would experience an alteration of all sensory perceptions and would be unable to distinguish between reality and fantasy.

The victim denied ingesting any hallucinogenic drug on the day in question. In addition, the State called Dr. Joerg Pirl, assistant chief toxicologist at the Department of Public Health, to testify as to the results of the tests he performed on the victim's blood samples. Dr. Pirl testified that he performed a mass spectrophotometry on the blood samples and found no presence of DMT in the victim's blood.

Defendant contends that the jury was faced with a situation in which it had to determine which expert opinion was correct with respect to whether DMT was in the victim's blood. However, defendant points out that the jury was not aware that the laboratory where Dr. Pirl, the State's expert, worked was consistently producing untrustworthy and inaccurate test results. Defendant further points out that the laboratory was ultimately closed down as a result of its inefficiency and untrustworthy test results.

Defendant's first contention on appeal is that his amended post-conviction petition, including the attached exhibits, raised substantial questions concerning the accuracy of the tests which the State relied upon at trial. As such, defendant argues that he should have been given a full evidentiary hearing to review the scientific evidence used at his trial.

The State argues that the trial court properly dismissed defendant's amended post-conviction petition without an evidentiary hearing. The State contends that the presence or absence of DMT in the victim's blood was not a dispositive issue at defendant's trial, but rather was simply one element when his defense was considered as a whole. The State points out that in addition to defendant's consent defense, defendant also raised an intoxication defense and provided various motives that the victim would have for falsely accusing defendant of raping her.

■■■ A trial court may dismiss a post-conviction petition without an evidentiary hearing if the petitioner fails to make a substantial showing that his or her constitutional rights have been violated. (*Peo-*

*ple v. Albanese* (1988), 125 Ill. 2d 100, 105; *People v. Silagy* (1987), 116 Ill. 2d 357, 365, *cert. denied* (1987), 484 U.S. 873, 98 L. Ed. 2d 163, 108 S. Ct. 212.) In order to make a substantial showing that the petitioner's constitutional rights have been violated, the allegations in the petition must be supported by the record or by accompanying affidavits. (*Albanese*, 125 Ill. 2d at 105; *People v. Avitia* (1989), 178 Ill. App. 3d 968, 969-70.) The denial of an evidentiary hearing on a post-conviction petition rests within the sound discretion of the trial court, and its decision will not be reversed on appeal absent an abuse of discretion. *Avitia*, 178 Ill. App. 3d at 970; *People v. Cobb* (1986), 150 Ill. App. 3d 267, 270.

In the instant case, defendant alleged in his amended post-conviction petition that the scientific evidence admitted during the trial, the blood analysis, was unreliable. To support his allegation, defendant attached several reports concerning the quality of the work of the State's laboratory which tested the samples of the victim's blood. Included among the reports were copies of the March 26, 1985, report of the Director of Public Health, Thomas Kirkpatrick Jr.; the March 28, 1985, report of the Director of Law Enforcement, James B. Zagel; the May 24, 1985, report of the director of the Chemical Toxicology Institute, Dr. Randall C. Baselt; and a 38-page report titled "Toxicology Final Report" (Final Report). Each of the reports evaluated and commented about the problems that the laboratory was experiencing. As a result of the investigations and subsequent reports, the lab was closed in 1985.

According to the Final Report, the laboratory was closed for "consistently and habitually" producing inaccurate scientific analysis of evidence. The report indicated:

> "*The most consistent analytical errors made by the Illinois Department of Public Health Toxicology Laboratory occurred in blood alcohol analyses. The errors made were due to poor chromatography techniques which resulted in consistently higher blood alcohol level determinations.* \*\*\* The ramifications of such errors on the state's Implied Consent Program are obvious. \*\*\*
>
> Additionally, *analytical errors in the identification and quantitation of drugs and drug metabolites have been made by the Illinois Department of Public Health Toxicology Laboratory.*
> \*\*\*
>
> Reanalyses have also revealed that *the Illinois Department of Public Health Toxicology Laboratory has either missed or*

*was unable to detect certain drugs in specimens. Among the missed or 'false negative' errors are the drugs ethchlorvynol, salicylate, caffeine, acetaminophen, probenecid, nicotine, and benzoylecognine.*" (Emphasis in original.)

The report concluded with the finding:

"The ramifications statewide of such errors could result in *the questioning of all prima facia [sic] evidence in blood alcohol analyses, particularly values one- to two-hundredths above the statutory 0.10 g% level.*" (Emphasis in original.)

Dr. Baselt's report commented on the testing procedures used at the laboratory, finding most to be unacceptable during his 1985 visit. In his report, Dr. Baselt stated that a "[r]eview of quarterly U.S. Department of Transportation Blood Alcohol Survey results for the period September, 1976 to October, 1984 indicate [sic] that the laboratory performed very well on these proficiency tests, never varying by more than 0.01% in blood alcohol concentration from the target value. Yet, re-analysis, by outside laboratories of a number of blood specimens collected from defendants during 1985 show [sic] that the Toxicology Laboratory's results have been overestimated by 10-20%." Dr. Baselt recommended that the laboratory be closed as a result of the inaccurate scientific testing problems in 1985.

A recent Illinois Supreme Court decision, *People v. Albanese* (1988), 125 Ill. 2d 100, has examined the laboratory's incompetence in conjunction with a post-conviction petition challenging the scientific evidence used at the defendant's murder trial. In *Albanese*, the defendant was convicted of the 1980 arsenic-poisoning murders of his father and wife's grandmother and the attempted murder of his brother. In 1981, the laboratory analyzed blood samples of the victims and determined that they were the victims of arsenic poisoning. In the defendant's post-conviction petition and at his evidentiary hearing, the defendant argued that he should be granted a new trial based on the laboratory's unreliable scientific analysis. *Albanese*, 125 Ill. 2d at 109.

The *Albanese* court considered the same reports that defendant relies upon in the case at bar. In addition, the defendant in *Albanese* also included a report from the director of forensic and environmental pathology at the St. Louis University Medical Center School of Medicine in his post-conviction petition.

The *Albanese* court accepted the defendant's arguments as being truthful and accurate, but went on to hold that the defendant was not entitled to a new trial. (125 Ill. 2d at 111.) The court noted that the final report, along with Dr. Baselt's report, gave no indication that

the laboratory was experiencing problems with its scientific testing in 1981, when the lab discovered the presence of arsenic in the blood samples. (125 Ill. 2d at 111.) The court stated that there was no evidence to show that the conditions which existed in 1985 and required the lab to close were also present in 1981. 125 Ill. 2d at 112.

The *Albanese* court further noted that even assuming *arguendo* that the 1981 lab results were inaccurate or unreliable, the defendant still would not be entitled to a new trial. The evidence adduced at trial indicated that the scientific evidence disclosing arsenic in the victim's blood was merely one link in a chain of circumstantial evidence tying the defendant to the arsenic-poisoning murders. (125 Ill. 2d at 113.) The court concluded that the cumulative effect of the evidence, even absent the lab's scientific test results, would be sufficient to convict the defendant of the crimes charged. 125 Ill. 2d at 113.

In the case at bar, defendant alleged that the lab's analysis of the victim's blood samples was inherently unreliable and inaccurate such that he was deprived of a fair trial. As such, defendant contends that the trial court erred when it dismissed the post-conviction petition without an evidentiary hearing. We disagree.

As we previously stated, defendant has alleged that the lab failed to discover the presence of DMT in the victim's blood when it performed the tests in 1982. However, defendant has failed to establish, either in his amended petition or in the attached affidavits and reports, that the lab's testing procedures in 1982 resulted in inherently unreliable test results. Simply because the lab experienced "problems" and was closed down in 1985 in no way establishes that the "problems" existed in 1982. See *Albanese*, 125 Ill. 2d at 112.

In addition, unlike the situation in *Albanese*, defendant exercised his opportunity to question the lab results at trial. Dr. Raymond Bath, the director of the toxicology laboratory at the School of Medicine in Rockford, testified that it was "most definitely" possible for one chemist to find DMT in a blood sample, and another chemist not to find it. Dr. Bath explained that the results could differ depending on the type of test performed on the samples. Dr. Bath concluded by stating that the fact that a chemist did not find the presence of DMT in the blood sample does not mean that the drug was not present in the sample. Thus, defendant was able to attack the lab's findings at trial.

Defendant admits presenting evidence on this issue at trial but argues that he could not fully present the issue to the jury because he was not aware of the incompetency of the lab work. However, defendant failed to allege, either in his amended post-conviction petition,

supporting affidavits and reports, or in his brief on appeal, any facts which would indicate that the lab work done in 1982 was inherently unreliable or incompetent.

Defendant argues that the trial court should have granted his request for an evidentiary hearing to allow him the opportunity to argue the reliability of the lab's test results. Defendant contends that the *Albanese* court had the benefit of a complete evidentiary hearing before making its factual conclusions. A reading of *Albanese* does indicate that the defendant received an evidentiary hearing with respect to the McHenry County trial (125 Ill. 2d at 110), but did not receive a hearing in the Lake County proceedings (125 Ill. 2d at 115). The supreme court held that the Lake County circuit court did not err in failing to hold an evidentiary hearing because the defendant failed to make a "substantial showing" that his constitutional rights were violated. (125 Ill. 2d at 115.) We believe that the *Albanese* decision directly supports the trial court's refusal to grant defendant an evidentiary hearing with respect to defendant's claims of inaccurate scientific testing in the present case. Defendant failed to make a "substantial showing" of a constitutional deprivation of his rights in this case. We make this determination after carefully reviewing defendant's amended post-conviction petition, along with its accompanying reports, letters, and affidavits.

Defendant's next contention on appeal is that he should have been given an evidentiary hearing to prove that his sixth amendment right to be tried by a jury selected from a fair cross-section of the community was violated. Defendant argues that the method of choosing the jury venire unfairly excluded non-Caucasians in defendant's case. We disagree.

■ Defendant cites *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, to support the proposition that the statistical evidence presented in his amended post-conviction petition was sufficient to raise a *prima facie* case of racial discrimination. In *Batson*, the Supreme Court held that a prosecutor may not use peremptory challenges to exclude veniremen solely on account of race. (476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1722-23.) The court stated that in order to establish a *prima facie* case of purposeful discrimination, the defendant must demonstrate that he or she is a member of a cognizable racial group and that the prosecutor has used peremptory challenges to remove members of that group from the venire. 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723; see *People v. Jones* (1988), 177 Ill. App. 3d 663, 665-66.

We do not believe that *Batson* is applicable in the present case.

*Batson* did not involve a claim that the jury was not selected from a fair cross-section of the community but instead dealt with the consequences of a prosecutor's use of peremptory challenges to have a direct impact on the selection of a jury *after* the venire had already been chosen. As such, we will review defendant's contention under a sixth amendment analysis.

■■ The sixth amendment to the United States Constitution requires that a petit jury be drawn from a venire representing a fair cross-section of the community. (*Taylor v. Louisiana* (1975), 419 U.S. 522, 528, 42 L. Ed. 2d 690, 697, 95 S. Ct. 692, 697.) The *Taylor* court noted that there is no requirement that the petit jury actually chosen must mirror the community and reflect the various distinctive groups in the community. (419 U.S. at 538, 42 L. Ed. 2d at 702-03, 95 S. Ct. at 702.) The court further stated that defendants are not entitled to a jury of any particular composition. 419 U.S. at 538, 42 L. Ed. 2d at 703, 95 S. Ct. at 702; see also *Lockhart v. McCree* (1986), 476 U.S. 162, 173-74, 90 L. Ed. 2d 137, 148, 106 S. Ct. 1758, 1765 (limited scope of fair–cross-section requirement is an "inevitable consequence of the practical impossibility of providing each criminal defendant with a truly 'representative' petit jury").

■■ ■ In order to demonstrate a *prima facie* violation of the fair–cross-section requirement, a defendant must show that (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in the venires from which juries are chosen is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to the systematic exclusion of this group in the jury selection process. (*Duren v. Missouri* (1979), 439 U.S. 357, 364, 58 L. Ed. 2d 579, 587, 99 S. Ct. 664, 668; *People v. Sledge* (1989), 183 Ill. App. 3d 1035, 1043-44.) Once the defendant has made a *prima facie* showing of discrimination in the jury venire selection process, the burden shifts to the State to demonstrate that a significant State interest is advanced by those aspects of the selection process which result in a disproportionate exclusion of the "distinctive" group. *Duren*, 439 U.S. at 367-68, 58 L. Ed. 2d at 589, 99 S. Ct. at 670; *People v. Broadnax* (1988), 177 Ill. App. 3d 818, 827-28.

In the case at bar, the venire from which defendant's jury was selected consisted of 60 persons, none of whom were black. According to defendant, who is black, the population of Winnebago County was 6% to 7% black at the time of defendant's trial. In addition, defendant claimed that the population of Rockford, the city where defendant lived and the crime occurred, was approximately 13% black. The trial

court accepted these figures as accurately reflecting the results of the 1980 U.S. census. Thus, based on the census, defendant argues that a truly random jury selection process would have resulted in at least three or four "non-caucasians" in the venire.

■ We believe that, after applying the *Duren* three-prong test to the facts of the instant case, defendant has failed to establish a *prima facie* violation of his right to a jury selected from a fair cross-section of the community. As to the first element, the fact that defendant is black does place him in a "distinctive" group within the community. (*Lockhart*, 476 U.S. at 175, 90 L. Ed. 2d at 149, 106 S. Ct. at 1765-66.) Thus, defendant satisfies the first prong of the *Duren* test.

As to the second and third prongs of the *Duren* test, defendant argues that the method of choosing the jury unfairly excluded "non-caucasians" from being a part of the venire from which defendant's jury was chosen. To support this assertion, defendant compared the population of blacks in Winnebago County (6% to 7%) to the number of blacks on his venire (zero). We do not believe that these allegations are sufficient to establish a *prima facie* violation of the fair–cross-section requirement under the sixth amendment. Defendant has failed to allege any facts which establish that the underrepresentation of blacks is due to some systematic exclusion in the jury selection process. (*Duren*, 439 U.S. at 364, 58 L. Ed. 2d at 587, 99 S. Ct. at 668.) In *Duren*, the selection process utilized allowed women to exempt themselves from serving on a jury, with the exemption becoming automatic if the woman did not respond to the jury summons. (439 U.S. at 366-67, 58 L. Ed. 2d at 588, 99 S. Ct. at 670.) This exemption was expressly limited to women and resulted in women comprising only 15.5% of the venire persons, even though 54% of the county's population were women. The *Duren* court held that this underrepresentation was sufficient to establish a constitutional violation of the fair–cross-section requirement. 439 U.S. at 370, 58 L. Ed. 2d at 590-91, 99 S. Ct. at 671.

■ In the case at bar, the process of selecting persons to serve on juries was done by utilizing voter registration lists. The selection of venires by using voter registration lists is expressly authorized by statute in Illinois. (Ill. Rev. Stat. 1981, ch. 78, par. 25; see *Sledge*, 183 Ill. App. 3d at 1045.) Using voter registration lists to select persons to serve on juries is facially neutral, as it allows no opportunity for subjective or racially motivated judgments. (*Broadnax*, 177 Ill. App. 3d at 831.) Defendant made no allegation, either in his amended post-conviction petition or at the hearing on the State's motion to dismiss the petition, to support his claim that using a voter registration list to

choose the venire in the present case unfairly excluded non-Caucasians. Defendant did not allege any special exemptions, like those present in *Duren,* or any other reason why the use of voter registration lists would have a discriminatory effect on the selection of venires in Winnebago County. Absent such an allegation, we believe that the trial court properly determined that defendant failed to establish a *prima facie* case of racial discrimination in the jury selection process. As such, we do not believe that the trial court abused its discretion in dismissing defendant's post-conviction petition without an evidentiary hearing.

For the above stated reasons, the judgment of the circuit court of Winnebago County dismissing defendant's amended post-conviction petition is affirmed.

Affirmed.

LINDBERG and McLAREN, JJ., concur.