THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LEROY BROADNAX, Defendant-Appellant.

Second District   No. 2—87—0077

Opinion filed December 28, 1988.

G. Joseph Weller, Michael F. Braun, and Kim M. DeWitt, all of State Appellate Defender's Office, of Elgin, for appellant.

Robert F. Casey and Gary V. Johnson, State's Attorneys of Geneva (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

John M. Lamont, of Thompson & Lamont, P.C., of Aurora, for *amicus curiae* Kane County Bar Association.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Leroy Broadnax, was tried by a jury in the circuit court of Kane County on two counts of armed robbery. (Ill. Rev. Stat. 1985, ch. 38, par. 18—2(a).) He was found guilty on both counts. At sentencing, one conviction was vacated and he was sentenced on the other to 20 years' imprisonment. He brings this direct appeal from that conviction and sentence.

These issues are raised: (1) whether the Kane County jury selection system resulted in the underrepresentation of blacks and Hispanics thereby depriving him of his right to a jury drawn from a fair cross-section of the community and equal protection; (2) whether identification evidence produced by an improperly suggestive showup should have been suppressed; and (3) whether the court misapplied the rule governing the substantive use of prior inconsistent statements when it denied his tendered instruction on this matter and precluded defense counsel from arguing the evidence substantively to the jury.

This case involved the robbery of a grocery store in Aurora on May 8, 1986, about 4:45 p.m. The robber, wearing sunglasses and a mask over his nose and mouth and carrying a gun and a bag, entered the store and jumped over the customer service area counter, accost-

ing the cashier, Diane Kinney. The robber, later identified as the defendant, demanded to know where the cash drawers were. He left Kinney and went down to the area of the lottery and liquor cash registers where cashier Christine Trotto was working. He jumped over the service counter, Trotto opened the cash register drawers, and he took $300 to $400. He then returned to the area where Kinney was, had her open the cash drawer, and then jumped over the counter and left the store. When the store security guard, William Foster, saw the robber jump over the counter, he (Foster) left the store and waited outside for the robber. The robber came outside without the mask on and drove off in a black-over-green 1973 Cadillac. Foster fired a shot at the right rear tire.

Shortly thereafter, Aurora police officer Pierceall, responding to a radio broadcast concerning the robbery, spotted the Cadillac in a playground parking lot. A black man named Graham was changing the right rear tire, and the defendant walked out from behind a building where several items, including a handgun and, nearby, two pair of sunglasses, were later found. The store security guard identified the defendant as the robber.

The defendant and Graham were then brought to the grocery store parking lot, where the store security guard again identified the defendant as the robber. Diane Kinney identified the defendant as the robber. Christine Trotto and Diane Kinney's two daughters, who were present during the robbery, were unable to identify the defendant. Aurora police officer Long's report recounting this showup at the grocery store indicated Kinney identified Graham rather than the defendant as the robber. Long explained, however, that the defendant's and Graham's names were transposed on his report, and he testified Kinney identified the defendant as the robber.

A customer in the grocery store at the time of the robbery, Dean Rosspank, also identified the defendant in a later lineup, and he testified at trial.

Among the pretrial motions filed by the defendant was a motion to quash the indictment and discharge the jury panel filed pursuant to section 114—3 of the Code of Criminal Procedure of 1963 (Code) and supported by affidavits. (Ill. Rev. Stat. 1985, ch. 38, par. 114—3.) His motion alleged that the method of jury selection in Kane County, which draws jurors only from a list of registered voters, results in underrepresentation of blacks and Hispanics on Kane County grand and petit juries in comparison with their proportionate presence in the total population of the community. That is, in the 1980 census, blacks comprised 4.9% of the Kane County population, whereas obser-

vations of the jury pool during the period July 28 to October 27, 1986, showed only 2.8% of the potential jurors were black. Further, Hispanics comprised 9.4% of the Kane County population, but observations of the jury venire during the same time period as above showed only 1.5% of potential jurors were Hispanics.

Finding the threshold requirements of section 114—3 of the Code had been met (Ill. Rev. Stat. 1985, ch. 38, par. 114—3), the trial court allowed the matter to proceed to hearing.

Brad White, a self-employed translator and interpreter of Spanish, Portuguese and French, was offered as an expert in the field of translation and languages. He testified that there are characteristics of Hispanic surnames which distinguish them from surnames of other ethnic and racial groups. Applying these characteristics, White reviewed a number of Kane County accounting system check registers reflecting payments made to jurors for service during the period July 28 to October 27, 1986. These registers purported to contain 982 names of persons who had served as petit jurors. Of that number, he identified 20 as being Hispanic and two others as possibly Hispanic.

Douglas Naughton, the court administrator for the Sixteenth Judicial Circuit, testified that the jury selection system for Kane County used the voter's registration lists. He said driver's license lists could be used, but were not used because the county lacked the resources to add this additional list. By "resources," he meant the programmers and analysts it would take to modify the system.

On cross-examination, Naughton testified it is not administratively and economically feasible at this time for Kane County to implement the multiple-list system. Duplicate names would have to be removed if the voter's and driver's license lists were to be combined. It would take a minimum of three or four experienced programmers/analysts to accomplish this work along with modification of about 40 other programs related to the voter's registration lists that would have to be changed as well. He testified that out of 22 circuit courts in the State of Illinois, there are none that use both driver's license and voter's registration lists as their jury source list. One county, Stephenson County, with a population of 50,000 to 55,000, has implemented the system which uses only the driver's license list. The population of Kane County is approximately 360,000. On redirect examination, Naughton testified it would not be impossible to make the switch, but that the resources to do so presently do not exist.

Barbara Bieritz, the chief clerk for the Kane County Jury Commission, testified that the response form completed by perspective jurors after they receive a jury summons does not have a place in which

to indicate their race. The court later took judicial notice of the juror qualification form and juror summons for the United States District Court for the Northern District of Illinois. The juror qualification form includes a question regarding race and ethnic origin.

Lucille Heninger, the chief bailiff of Kane County, testified that one of her duties was to check on prospective jurors when they reported to the courthouse for jury duty. Each person reporting for jury duty is given a jury questionnaire to complete. The questionnaire does not ask the prospective jurors to indicate their race or ethnic origin. After serving on a jury, jurors are asked to complete an exit questionnaire. There is no place to indicate race or ethnic origin on this questionnaire.

Assistant public defender Donald Lorek testified that he observed prospective jurors on July 28, 1986, and July 30, 1986. On these two occasions, he saw about 80 people. He concluded that there was one black woman, a woman who possibly was black, an Hispanic woman and a woman and a man who possibly were Hispanic. Lorek explained that he was not an expert in racial identifications and that his conclusions were based on his observations of skin color and facial features.

The prosecutor stipulated to the contents of a law student's affidavit that of 54 prospective jurors viewed by him on August 4, 1986, one was black and none were Hispanic. It was further stipulated that the student, James Snyder, reached his conclusion "on the basis of his own opinion, based upon his experiences in life, not as an expert."

An investigator for the Kane County public defender's office, Tracie Turner, testified that she was not an expert in identifying ethnic backgrounds. She had conducted "a couple hundred" interviews for the public defender's office and had been asked before to identify people on the basis of their racial or ethnic background. It was stipulated that her testimony as to her observations would be consistent with her affidavit. Her affidavit, which covered juror observations three times in August, four times in September, and four times in October of 1986, showed 690 jurors were observed of whom 22 were black, 11 were Hispanic, and 2 were oriental.

The prosecutor stipulated that on any given date, no more than one or two potential jurors missed the jury movie at which the public defender's office conducted its observations.

Affidavits from three trial attorneys were also admitted. Van Richards' affidavit stated he was admitted to practice in 1960 and that in the more than 80 jury trials he had conducted in Kane County, he estimated that blacks constituted 1% and Hispanics .5% of the prospective jurors. Fred Morelli's affidavit stated that he was admitted

to practice in 1966 and he had tried in excess of 100 jury trials in Kane County. He estimated that blacks comprised 1% and Hispanics 3% of the prospective jurors. Frank Giampoli's affidavit stated that he was admitted to practice in 1974 and had tried 12 to 15 jury trials in Kane County. In his estimate, blacks comprised 1% to 3% and Hispanics 2% to 6% of the jury venire.

The court took judicial notice, *inter alia*, of the legislative debates concerning the amendments to section 1 of "An Act concerning jurors ***" (Ill. Rev. Stat. 1985, ch. 78, par. 1) and section 2 of "An Act in relation to jury commissioners and authorizing judges to appoint such commissioners and to make rules concerning their powers and duties" (Ill. Rev. Stat. 1985, ch. 78, par. 25). These amendments provided for the selection of jurors by counties from either the driver's license list or the voter's registration lists or, in the case of a jury commission system, from either only the voter's registration list or from a combination of the two lists. The court also took judicial notice of 1980 census and racial breakdown data for Kane County.

The court admitted an affidavit of Kane County Clerk Roberta Harper, which indicated she did not keep any race or ethnic background data on registered voters, and it admitted United States Department of Commerce census bureau data indicating there were no specific race statistics for Kane County voters.

The court denied the defendant's motion to discharge the jury panel, ruling, in part:

> "I find that while panels and venire from which jurors are drawn must not systematically exclude distinctive groups in the community, that a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury panel or venire from which grand and petit jurors are drawn, that neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportion and strength of every identifiable group, that the jury commission for Kane County followed the mandates of the statute in compiling lists of potential grand and petit jurors from the county's list of legal voters, that no evidence of any legal [*sic*] discrimination was presented in the procedure used by the Kane County Jury Commission in its selection of jury panels and venire."

The court then added its conclusion that the evidence presented by the defense was inadequate and insufficient to establish a *prima facie* case.

At the sentencing hearing, the court denied defense counsel's mo-

tion to file a master's thesis, entitled "Statistical and Empirical Theoretical Evaluation of the Representativeness of the Jury Selection Process of the Sixteenth Judicial Circuit in Kane County," which was prepared by Greg Whipple, an employee of the chief judge's office in 1981. The report counted the number of jurors reporting from June 1980 through February 1981. Of the 2,939 jurors counted, 61 or 2.08% were black and 26 or .885% were Hispanic. The trial court sustained the State's objection to the report. He allowed it to be made part of the record as an offer of proof.

Defendant contends the evidence he presented established all three elements of a *prima facie* violation of the requirement that grand and petit juries are to be selected from representative cross-sections of the community. He further contends he also established a *prima facie* case of violation of his right to equal protection from discrimination in the selection of grand and petit juries. He requests his conviction be reversed, the indictment quashed, and the cause remanded for new proceedings, should the State choose to reindict, in which the grand and petit juries will be selected from venires that adequately represent blacks and Hispanics.

The Kane County Bar Association as *amicus curiae* filed a brief in support of the use of voter's lists and driver's license holder lists in drawing jury pools.

The State submits the defendant's evidence fell far short of establishing the second and third elements of his *prima facie* case of a fair–cross-section violation. Further, that he failed to show an equal protection violation in that he failed to show that the system used by Kane County substantially underrepresented his race over a significant period of time. It urges this court to deny defendant's request for reversal, quashing of the indictment and remand for new proceedings. The State also contends the brief of *amicus curiae* should not be considered by this court inasmuch as it improperly attempts to modify the record by inclusion of various materials appended to its brief which were not introduced as evidence.

We conclude the defendant failed to establish a *prima facie* case of deprivation of his right to trial by a jury comprised of a fair cross-section of the community, and that he did not establish a *prima facie* case of a violation of his right to equal protection.

■ At the outset, we agree with the State that the brief of *amicus curiae* will not be considered by this court because it attempts to present factual material not received in evidence below. " '[A]*micus curiae*' is not a party to the action, but a friend of the court. As such, the sole function of an *amicus* is to advise or make suggestions to the

court. [Citations.]" (*Zurich Insurance Co. v. Raymark Industries, Inc.* (1987), 118 Ill. 2d 23, 59; *In re Petition to Call an Election* (1987), 164 Ill. App. 3d 392, 394.) In *Zurich*, the court granted motions to strike two *amicus curiae* briefs which either included or relied upon materials which were not received into evidence, and, therefore, were not part of the record on appeal before the court. *Amicus* here similarly appends and relies on materials which were not received in evidence at the hearing below. Consequently, these materials will not be considered by this court.

■■ ■ Under the equal protection clause, selection of both grand and petit jurors must be free from any taint of discriminatory purpose. (U.S. Const., amend. XIV; *Strauder v. West Virginia* (1880), 100 U.S. 303, 25 L. Ed. 664.) Although there is no requirement that petit juries actually chosen must mirror the community, and defendant is not entitled to a jury of any particular composition, there is a sixth amendment right to a petit jury selected from a representative cross-section of the community, and the jury wheels, pools of names, panels, or venires from which petit juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof. (*Taylor v. Louisiana* (1975), 419 U.S. 522, 538, 42 L. Ed. 2d 690, 702-03, 95 S. Ct. 692, 701.) The selection of the grand jury as a whole similarly must be drawn from a fair cross-section of the community in accord with "the representational due process values expressed in *Peters* [*v. Kiff* (1972), 407 U.S. 493, 33 L. Ed. 2d 83, 92 S. Ct. 2163]." *Hobby v. United States* (1984), 468 U.S. 339, 345, 82 L. Ed. 2d 260, 267, 104 S. Ct. 3093, 3097; see also 2 W. LaFave & J. Israel, Criminal Procedure, §15.3, at 73 (1988).

### FAIR CROSS-SECTION

The parties are in agreement:

"[I]n order to establish a *prima facie* violation of the fair–cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri* (1979), 439 U.S. 357, 364, 58 L. Ed. 2d 579, 586-87, 99 S. Ct. 664, 668.

■ After a *prima facie* case is established, the burden shifts to the State to demonstrate that "a significant State interest [is] mani-

festly and primarily advanced by those aspects of the jury-selection process *** that result in the disproportionate exclusion of a distinctive group." (*Duren*, 439 U.S. at 367-68, 58 L. Ed. 2d at 589, 99 S. Ct. at 670.) The State must advance more than " 'merely rational' " grounds for the underrepresentation. (*Duren*, 439 U.S. at 367, 58 L. Ed. 2d at 589, 99 S. Ct. at 670, citing *Taylor*, 419 U.S. at 534, 42 L. Ed. 2d at 700, 95 S. Ct. at 700.) The justification for the exclusion of one or more distinctive groups in the community must be based on weightier reasons than "administrative convenience" (*Taylor*, 419 U.S. at 534-35, 42 L. Ed. 2d at 700-01, 95 S. Ct. at 700); "the State *** bears the burden of justifying [the] infringement by showing attainment of a fair cross-section to be incompatible with a significant State interest." *Duren*, 439 U.S. at 368, 58 L. Ed. 2d at 589-90, 99 S. Ct. at 671.

▪ As to the first element, the defendant contends, and the State does not dispute, that blacks and Hispanics constitute "distinctive" groups within the community. (*Lockhart v. McCree* (1986), 476 U.S. 162, 175, 90 L. Ed. 2d 137, 149, 106 S. Ct. 1758, 1766.) Thus, defendant's evidence satisfied the first element of a *prima facie* case as set forth in *Duren*.

▪ As to the second element, the defendant argues this was established by evidence of the 1980 census figures showing the percentage of blacks (4.9%) and Hispanics (9.4%) in Kane County compared with the percentage of blacks (2.8%) and Hispanics (1.5%) who were observed over a four-month period in Kane County jury venires totaling 880 prospective jurors. This evidence was supplemented with Brad White's review of jury lists covering the period July 28 through October 27, 1986, which revealed 22 Hispanic or possibly Hispanic names (less than 2.3%) out of 982 names on the lists. Defendant contends the foregoing evidence of underrepresentation was "fully consistent" with the evidence of underrepresentation gathered in the master's thesis prepared in 1981 by an employee of the Kane County circuit court chief judge's office. This master's thesis was not admitted in evidence, however, and defendant does not argue here that it was error for the court to have refused it. Accordingly, the question is waived and the thesis is not properly a part of the record before this court.

The State argues defendant's statistical evidence is inadequate, unreliable, and was not accumulated over a sufficient period of time.

The trial court ruled that the defendant's evidence was inadequate and insufficient to satisfy the second element of his *prima facie* case: that the representation of blacks and Hispanics in the venires ob-

served was not "fair and reasonable" in relation to the number of blacks and Hispanics in Kane County.

■ Initially, the burden is on the defendant in this case to produce evidence supporting this proposition. He must establish a foundation for such evidence. He must establish, further, that the evidence he offers is material to the issues, is relevant to the issue, and is competent evidence. Assuming for purposes of this argument that the various matters of evidence he has proffered are material to the issue, and also relevant, we must ask ourselves, is it competent evidence? The trial judge has decided that it is not competent. That is, he found the evidence to be inadequate and insufficient to prove the proposition upon which the defendant had the initial burden of proof. We are unable to say that the learned and experienced trial judge was in error in this finding and in the ruling upon which it is based.

The trial judge was not persuaded by the testimony of the staff members of the public defender's office and the affidavits of the three private attorneys, and neither are we.

Witness Donald Lorek observed prospective jurors on only two occasions. James Snyder observed the venire on only one occasion. Tracie Turner, who observed the venire on a number of occasions during August, September and October 1986, testified that she had no expertise in identifying persons by race or ethnic origin. She stood by the door to the jury assembly room and made visual observations of the jurors entering. The prospective jurors walked by her.

Attorney Van R. Richards, Jr., made an affidavit based on his observation of some 80 juries over a 26-year period. The affidavit of attorney Fred Morelli covered 100 juries over a 20-year period, and the affidavit of Frank Giampoli was based on 12 to 15 juries over a 14-year period. No information is given as to the relative minority populations over those years for comparisons. These random observations were deemed clearly insufficient by the trial court and we cannot gainsay his ruling in this regard.

Witness Brad White, who purported to testify with some degree of expertness in Spanish language matters, sought to identify the number of Hispanic surnames he found on the juror list. He was, however, unable to say how many of the females on the lists might have been non-Hispanic but married to men with Hispanic surnames.

It does not appear that the observations of the witnesses in the case at hand represented a scientific approach to the determination of the issue, nor was it conducted with the reliability of the study in the *Duren* case (*Duren v. Missouri* (1979), 439 U.S. 357, 58 L. Ed. 2d 579, 99 S. Ct. 664).

The material presented by the defendant in this issue is not methodologically valid or adequate to establish that the Kane County jury was not selected from a representative cross-section of the community.

## EQUAL PROTECTION

■ The court in *Castaneda v. Partida* (1977), 430 U.S. 482, 494-95, 51 L. Ed. 2d 498, 510-11, 97 S. Ct. 1272, 1280, set forth the elements of a *prima facie* case of an equal protection violation. First, the defendant must establish that the group to which he belongs is one that is a recognizable, distinct class, capable of being singled out for discriminatory treatment. Second, the defendant must prove substantial underrepresentation over a significant period of time, and third, the defendant must show discriminatory purpose either by the strength of his statistical showing, *i.e.*, "the rule of exclusion," or by showing a selection procedure that is susceptible of abuse or is not racially neutral to support the inference of discrimination raised by substantial underrepresentation. See also *People v. Rosa* (1982), 111 Ill. App. 3d 384, 388.

■ The defendant here, a black man, asserts, and the State does not dispute, that he belongs to a recognizable distinct class of persons capable of being singled out for discriminatory treatment. Thus, the first element of the defendant's *prima facie* case has been met.

■ Next, the defendant asserts he has met the "rule of exclusion" through his evidence of jury observations and affidavits of trial attorneys which showed that blacks are substantially underrepresented on jury venires in Kane County in comparison with the number of blacks in the total population. It was stated in *Castaneda* that "the idea behind the rule of exclusion is [that] *** [i]f a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process." *Castaneda*, 430 U.S. 482, 494 n.13, 51 L. Ed. 2d 498, 510 n.13, 97 S. Ct. 1272, 1280 n.13.

The State argues the rule of exclusion has not been met where the underrepresentation over a significant period of time has not been shown and where t̄ ə absolute disparity of 2.1% between the number of blacks in the county and those represented on the venire is not significant when compared with *Castaneda* (40.1%) and other like cases such as *Turner v. Fouche* (1970), 396 U.S. 346, 24 L. Ed. 2d 567, 90 S. Ct. 532 (23%), *Whitus v. Georgia* (1967), 385 U.S. 454, 17 L. Ed. 2d 599, 87 S. Ct. 643 (18%), *Sims v. Georgia* (1967), 389 U.S. 404, 19

L. Ed. 2d 634, 88 S. Ct. 523 (19.7%), and *Jones v. Georgia* (1967), 389 U.S. 24, 19 L. Ed. 2d 25, 88 S. Ct. 4 (14.7%).

■■■ In reply, defendant cites *Alston v. Manson* (2d Cir. 1986), 791 F.2d 255, where the court struck down a jury selection system that resulted in a 1.5% absolute disparity underrepresentation of blacks, and where it suggested, without deciding, that the absolute disparity approach was outmoded and should be discarded. The *Alston* court used the "Statistical Decision Theory" (in effect, *Castaneda*'s "rule of exclusion"), "[t]he goal of [which] inquiry is to determine if chance alone could account for a meager representation of minorities." (791 F.2d at 258.) Using the "Statistical Decision Theory," the court in *Alston* found the odds there of only 368 blacks appearing by happenstance in an array of 8,405 persons rather than the expected 501 blacks, were 3 in 1 billion. Unlike the instant cause, however, the *Alston* petitioners' *prima facie* case of discrimination was securely bolstered by a showing that the selection procedure was not racially neutral. A Connecticut statute there established a strict quota system which favored representation in the array of adults from the smaller towns of the State as opposed to the more populated urban settings where a larger concentration of the black population indisputably lived. Here, the selection procedure, voter's registration lists, is racially neutral. It allows no opportunity for subjective or racially motivated judgment. Consequently, it does not aid defendant's establishment of a discriminatory purpose.

Substantial underrepresentation over a significant period of time has not been shown. The period of time over which the comparative disparity here was observed was essentially the four-month period July through October 1986. Contrasted with the 11-year period in *Castaneda* as urged by the State, the significance of this period pales. Defendant's assertion that the period of time covered by his statistics is five years incorrectly assumes that this court is able to consider the master's thesis study performed in 1981 which was included in the record as an offer of proof but which was not admitted below. In concluding that the four-month period is not a significant period of time, we have taken into account the fact that the statistical evidence of underrepresentation is inadequate and that the selection procedure is racially neutral and does not lend any support to defendant's claim of discriminatory purpose.

In sum, we conclude defendant has not established a *prima facie* case of violation of his fourteenth amendment right to equal protection.

Defendant next contends the second showup identification of him

conducted at the grocery store parking lot was improper, and any evidence flowing from that showup should be suppressed; that is, the testimony of Diane Kinney and police officer Long should have been suppressed. The essential facts are that shortly after the grocery store was robbed, the police conducted a showup identification at the playground parking lot where the defendant and another man, Graham, were arrested and being held. At this showup, William Foster, the grocery store security guard, viewed two handcuffed black males lying on the ground. He identified the defendant as the robber. Immediately afterward, the two black men were placed in the back of a police van and taken to the grocery store parking lot. There, Foster, the two cashiers, Diane Kinney and Christine Trotto, and Kinney's two daughters were asked to look, one at a time, at the two men in the back of the police van to see if they could identify the robber. Foster identified the defendant again, and, according to police officer Long, who was present, Kinney also identified the defendant as the robber. Trotto was not able to make an identification. Kinney identified the defendant at the suppression hearing and at trial.

An accused is entitled to a fair identification procedure and is deprived of due process if the totality of the circumstances of a pretrial confrontation are unnecessarily suggestive and conducive to mistaken identification. (*Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967.) The primary evil to be avoided is "a very substantial likelihood of irreparable misidentification." (*Simmons v. United States* (1968), 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971.) "Although it is true that [one-man] showups are not favored and are even condemned, they have been justified where it was uncertain a victim would survive, a witness had an excellent opportunity to observe the defendant during the commission of the crime, the identified person was known to the witness before the commission of the crime, the suspect had unusual distinguishing characteristics, or *** prompt identification was necessary for the police to determine whether or not to continue their search. [Citation.]" (*People v. Manion* (1977), 67 Ill. 2d 564, 569-70.) Admission of evidence of a showup without more, however, does not violate due process; "the central question [is] whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers* (1972), 409 U.S. 188, 199, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382.

Defendant relies on *People v. McMath* (1970), 45 Ill. 2d 33, in support of his argument that the second showup here was unjustified. In *McMath*, the victim identified the defendant in a one-man showup at a

service station very shortly after she was robbed in the area of the station. Later the same day, she identified him again in a one-man showup at the police station. The court found the service station showup was justified by the need for prompt identification, but found no circumstances which justified the later showing of the defendant at the police station. However, inasmuch as identification of the defendant could have been established apart from and independent of the police station and the in-court identification, the court found the defendant was not denied due process. *McMath*, 45 Ill. 2d at 37.

The second showup here was justified. Unlike *McMath*, these were two-man showups, not one-man, enhancing somewhat the reliability of the resulting identification. Also, both showups here occurred within 20 minutes of the grocery store robbery, and the second showup was held in front of four other eyewitnesses who might have been able to corroborate immediately the identification made by Foster at the first showing. Three of the witnesses could not identify the defendant at this second showup, but Diane Kinney did. It would have been unreasonable for the police under the circumstances to forgo the opportunity to have Foster's identification of the defendant corroborated by these other readily available eyewitnesses.

■■■ Notwithstanding the justifiability of this second showup, the central question is still whether Kinney's showup identification of the defendant was reliable. If it was, then any in-court identification of the defendant was proper. (*People v. Manion* (1977), 67 Ill. 2d 564, 572, citing *Manson v. Brathwaite* (1977), 432 U.S. 98, 110 n. 10, 53 L. Ed. 2d 140, 151 n.10, 97 S. Ct. 2243, 2251 n.10.) "The factors to be considered in evaluating the likelihood of misidentification include [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation." *Neil v. Biggers* (1972), 409 U.S. 188, 199, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382.

■■■ Despite the defendant's argument to the contrary, we think the likelihood of misidentification here was minimal, if not nonexistent. Kinney had ample opportunity to observe the defendant, who actually touched her on her shoulders and upper arms several times during the incident. Her attention throughout the incident, except for one brief moment when she looked at her daughter, was on the defendant and on his movements about the store. Although she herself thought it was bizarre, she testified she was unafraid at the time of the robbery even though she did notice the gun the defendant was

carrying. Kinney's purported identification of the defendant to police officer Long as being 5 feet 3 inches tall (defendant is 6 feet tall) was shown to be incorrect on cross-examination of Officer Long, when his memory was refreshed by his report which indicated Kinney stated the defendant was 6 feet tall. Kinney also identified the defendant to another officer as being about four or five inches taller than herself at 5 feet 6 inches. Kinney was certain of her identification of the defendant at the showup; defendant's assertion Kinney identified Graham at the showup rather than him was explained when Officer Long admitted on cross-examination he had transposed the defendant's and Graham's names in his report and testified it was the defendant whom Kinney identified at the showup. Lastly, the interval between the robbery and the first showup was approximately 15 minutes, and the time between the first and second showups, five minutes.

We conclude Kinney's out-of-court identification of the defendant was reliable. Consequently, so was her in-court identification and Officer Long's testimony. *Manion*, 67 Ill. 2d at 572.

■■■ Defendant's final contention is that police officer Long's report—which indicated Diane Kinney identified Graham, not him, at the second showup—was admissible as substantive evidence under section 115—10.1 of the Code of Criminal Procedure (the Code) (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1), and that the court erred when it denied defense counsel the opportunity to argue to the jury, and to have the jury instructed on, the substantive use of this evidence.

The State's argument in response concedes that it was error for the court not to allow the use of Long's prior inconsistent report as substantive evidence but that, even so, the error was harmless considering the strength of the State's evidence. We agree.

Long's report clearly met the requirements of section 115—10.1 of the Code, and the use of it as substantive evidence should have been allowed both for purposes of closing argument and for instructing the jury as to the extent to which it could consider this evidence. (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1; *People v. Wilson* (1986), 149 Ill. App. 3d 1075, 1078-79.) Nonetheless, the error here was harmless and no reversal is warranted.

The instant situation is unlike that in *People v. Wilson* and two other recent cases, *People v. Hastings* (1987), 161 Ill. App. 3d 714, and *People v. Winfield* (1987), 160 Ill. App. 3d 983, where the evidence which established an element crucial to the outcome of the case was contained only in the prior inconsistent statement at issue. Here, in addition to Kinney's in-court identification of the defendant and her testimony that "the other man that was in the back of the van [Gra-

ham]" was not the man who robbed her, there were two other eyewitnesses, Foster and Rosspank, who identified the defendant as the robber. Consequently, there does not appear to be a reasonable probability that Officer Long's report would have changed the outcome of the trial had it been properly allowed as substantive evidence, particularly in light of Long's explanation for the mix-up in the names in his report. It has been held that a reviewing court will not reverse a judgment merely because error has been committed unless it is evident that real justice has been denied or that the finding of guilty may have resulted from such error. (*People v. Lucas* (1986), 140 Ill. App. 3d 1.) We conclude the court's error was harmless.

The judgment of the circuit court of Kane County is affirmed.

Affirmed.

LINDBERG, P.J., and WOODWARD, J., concur.